# Wheeling.

## FENTON F. RANDOLPH vs. SAMUEL GOOD, et al.

### August Term, 1869.

The act of the legislature passed February 25th, 1865,* in relation to challenging voters and requiring them to take the oath therein prescribed, is not unconstitutional.

In November, 1865, Fenton F. Randolph brought suit in the circuit court of Harrison county, against Samuel Good, Lewis Davis and William J. Williams, alleging in the declaration, that at an election held in Ten-Mile township in said county, in October, 1865, the plaintiff offered to vote at said election, and that the defendants, who were the supervisor and inspectors of election at said voting place, refused to receive his vote, whereby he was damaged to the amount of 1,000 dollars. The defendants pleaded not guilty, and subsequently filed a special plea, stating that at the time the plaintiff offered to vote, his vote was challenged by a legal voter, and the defendants thereupon refused

---

* "2. If the vote of any person offering to vote at any election shall be challenged by any voter present, the supervisor and the inspectors of the election shall refuse to allow such person to vote until he shall produce to them an affidavit as follows:

"Township of ———, ——— county, to-wit:

"I, A. B., (name of affiant), do solemnly swear that I have never voluntarily borne arms against the United States, the reorganized government of Virginia, or the State of West Virginia; that I have never voluntarily given aid, comfort or assistance to persons engaged in armed hostility against the United States, the reorganized government of Virginia, or the State of West Virginia; that I have not at any time, sought, accepted, exercised or attempted to exercise any office or appointment whatever, under any authority or pretended authority, hostile or inimical to the United States, the reorganized government of Virginia, or the State of West Virginia; that I have not at any time yielded a voluntary support to any government or pretended government, power or constitution within the United States, hostile or inimical thereto, or hostile or inimical to the reorganized government of Virginia, or the State of West Virginia; that I will support the constitution of the United States, and the constitution of the State of West Virginia; and that I take this oath freely, without any mental reservation or purpose of evasion."

to receive his vote unless he should produce to them an affidavit as prescribed by the act of the legislature passed February 25th, 1865, which affidavit he refused to produce. To this plea the plaintiff demurred and the defendants joined.

On the hearing, the court overruled the demurrer, and gave judgment for the defendants for costs.

The plaintiff brought the case here on a supersedeas, alleging that the act of February 25th, 1865, was unconstitutional.

*Lamb* for the plaintiff in error.

*C. S. Lewis* for the defendants in error.

BROWN, President. The question is whether the act of February 25th, 1865, is void for repugnancy to the constitution.

It was passed in the midst of a civil war. Its object was to defend the State against the enemy by guarding the ballot against their control.

Enemies in war had no right to vote, hold office, nor sue under the government they sought by force to subvert.

Halleck, quoting from Wheaton on International Law, says: "debts previously contracted between the respective subjects, though the remedy for their recovery is suspended during the war, are revived on the restoration of peace, unless actually confiscated in the meantime in the rigorous exercise of the strict rights of war contrary to the milder practice of recent times." Halleck, 852; *Quarrier's case*, 2 W. Va., 569. And again he says, p. 371, sec. 24, "it would be absurd to suppose that persons who are hostile themselves, or who are under hostile authority, are to exercise the same civil rights as neutrals or citizens in time of peace."

Here the right to confiscate the debt is as distinctly recognized as the revival of the right to sue for it, on the restoration of peace, if not confiscated in the meantime. The right to vote, if it ever existed in the case of any par-

ticular enemy, would be as effectually suspended by war as would the right to sue, and whether it would revive after peace or not, is not the question, but whether the State could confiscate the right, if it could be called such, or rather defeat its revival by a prohibitory statute, is the true point for consideration.

It is as competent for the State to continue the suspension by positive law as it is to continue to withhold the property confiscated. Because the State has the right, and it is its highest duty to defend itself and citizens against the assaults of the enemy, it has the right to use the means necessary and proper to that end. In the judgment of the legislature the act in question was among such means, and it would seem to be extra judicial to sit in judgment upon the wisdom and policy of the act, where the power of the legislature was equal to the task.

. The object of the constitution was to guard the rights of the citizens, that is the people who submitted to its authority and sustained the government ordained under it, and not the public enemies against whom the government was making desperate resistance in open war. The constitution was formed in the midst of a civil war by the loyal people who were resisting the enemy in that war. It was formed to preserve the rights and liberties of the people who ordained it and as a means in part to that end to resist the enemy by an organized government secured against the assaults of the enemy from without and within. The statute of the State of Virginia, before the organization of the State of West Virginia, declared that any citizen who should thereafter levy war against the United States, &c., should be considered as having expatriated himself so far as regards the State, and shall be deemed no citizen thereof. Nor were the loyal people singular in this, for the rebels not only prescribed and enforced the policy of oaths and abjuration, but by their pretended laws declared the loyal people enemies and traitors and expatriated and decitizenized.

I take it then that the legislature had the constitutional

power to exclude the enemies of the State from the polls. and to continue them so excluded as long as it might be necessary to the public security. That such is the effect of the act in question, and the mode by which it is effected, is both simple, natural and effective, if indeed it is not the only effectual mode that could be adopted. It debars no loyal citizen from the right of voting, but secures him in it by a distinction between friends and enemies, and makes the distinction apparent by a test which injures no one, unless it can be said that not to allow enemies to vote who had no right to vote, is unjust, and a punishment to them. I don't believe it to be punishment in any proper sense of the term to withhold from an "enemy" in war the right to vote me out of my house, when he finds it on trial somewhat difficult and dangerous to drive me out by force.

If after the war had terminated and peace restored, those who were enemies, had become friends and regained their rights, if they had any, or whether they ever had any right to vote or not before the war, if they subsequently obtained such right by the laws of the land, and the legislature should attempt by statute to divest such right, either directly or indirectly, then it would be obnoxious to the charge of invading and divesting vested rights, and on that account repugnant to the fundamental law. But that is not the case here. This act was passed pending the war, and though it does not in terms say enemies shall not vote, it does so in effect, by describing the acts which constitute the actors "enemies" within the meaning of the laws defining who are enemies. It was a war measure and one of many of kindred nature which the war and the times originated and alone justified, and which it is to be hoped will disappear with the occasion that led to their enactment. But until the law making power shall repeal, I feel myself constrained to submit to its mandate, however a change of time and circumstances may have made the same inapplicable or less suited than when enacted. As friends might vote, and enemies might not, whoever would vote should show himself a friend, and that he might do by showing

negatively that he was not an enemy.    Certainly he who would not when allowed upon his own evidence to show himself not an enemy would give very little indication of the qualifications of a voter in time of peril and when the first and most important inquiry was whether he was a loyal citizen or a public " enemy?"

Though this act divested no vested right, yet its effect now is to prevent those who were enemies from becoming rein-vested with the rights which they forfeited.   But that does not militate against its validity.   And although the circum-stances which induced and alone justified the act when passed may have changed, yet no such change will repeal the act nor invalidate a law valid at the time of its passage, nor justify a court in disregarding its provisions, however unpalatable, so long as the legislature shall choose to con-tinue it unrepealed on the statute book.

I think, therefore, that there was no error in the circuit court overruling the demurrer to the defendant's plea, nor is there error in the judgment complained of.

The judgment, therefore, of the circuit court should be affirmed, with costs to the defendant in error.

The other judges concurred.

JUDGMENT AFFIRMED.