# Wheeling.

## *Ex parte* QUARRIER AND FITZHUGH.

### January Term, 1870.

1. A party having qualified as an attorney before the passage of the attorneys' test oath act, of February 14th, 1866, did not require such a vested right in the office of attorney, as released him from being required to take the oath prescribed in that act.

2 The act of February 14th, 1866, known as the attorneys' test oath act, is not unconstitutional. It is not *ex post facto*, because *ex post facto* laws relate to penal and criminal proceedings, and not to civil proceedings which effect private rights retrospectively.

3. A pardon by the President of the United States to an attorney who had engaged in the late rebellion, while it may restore him so far as to permit him to practice in Federal courts, cannot restore his standing in a State court.

This case was argued at a former term, and the decision of the court announced, but the opinion of President Brown was not filed until this term. The act having been repealed since the decision, the judgment in this case now entered did not interfere with the right of the parties to qualify.

A number of gentlemen of the bar appeared for the applicants.

*The Attorney General* for the State.

BROWN, *President.*

This is an application by Messrs. Quarrier and Fitzhugh to be allowed to practice as attorneys in this court, without taking the oath prescribed by the act of February 14th, 1866.

The applicants, by their counsel, admit their inability to take the oath prescribed by said act for attorneys, because they had borne arms against the United States in the late war of rebellion. It was also claimed for them, and not controverted by the Attorney General, who opposed the application, for the State, that they had been pardoned for their complicity in the rebellion by the executive authority of the United States.

Their cases differ, however, in this, that Mr. Quarrier had been admitted to qualify and practice as an attorney in this court, at the January term, 1866, upon his taking all the oaths then required by law of an attorney, which he did, and thence became engaged as counsel and attorney in several causes pending in this court.

Mr. Fitzhugh, on the other hand, had not been so admitted, when the act of February 14th, 1866, was passed, nor has he been since admitted, but his present application is his first step in this court to that end, since his character of enemy in said war terminated.

Though argued together I shall consider them separately, to avoid confusion.

According to the decision of this court in *Quarrier's case*, 2 W. Va. Rep., 569, and his admission and qualification as an attorney thereof, he became thereupon invested with a legal right to appear and practice as an attorney of this court, in other words, he became an officer of the court with rights, duties, and privileges; an office *sui generis*, and essential to the proper administration of justice. *Hunter's case*, 2 W. Va. Rep., 143. And in the case of *Norwich* vs. *Berry*, 4 Burrows, 2115, it was said by Yates, J: "The court must have ministers; the attorneys are its ministers," whose assistance for defence is secured to the accused by the 8th section of the 11th article of the constitution of this State.

The statute in question, if applied to Mr. Quarrier, deprives him therefore of a vested right, and the court of a ministerial officer. It debars him the exercise of an "office

of dignity and honor, and influence," and deprives him of "privileges and immunities" of more than money value.

So far as the act would affect him for the identical cause, viz: for having borne arms against the United States, but pardoned for it, which this court decided in his case before the passage of the act, to be no cause of excluding him from this bar, it might be a question worthy of consideration, if necessary to the determination of the case, whether the act did not impinge upon the privilege of the court, and whether it was not, in effect, though not in form, a judicial rather than a legislative act, and the result equivalent to a reversal of the judgment of this court in the applicant's own case.    Upon this point, however, I do not deem it necessary to express any opinion, but will proceed to the consideration of another view of the case.

If the act in question be applied to Mr. Quarrier upon the case presented, it deprives him, as has been seen, of a vested right of more than money value, without just compensation, and constrains him to violate his undertakings to his particular clients.    The first ground would be repugnant to that clause of the State constitution which prohibits the taking of private property without just compensation; and the second ground would violate, in the particular instances, but in those only, that clause of the Federal and State constitutions which prohibits all laws impairing the obligation of contracts.

If the act, therefore, in terms applied to Mr. Quarrier, I should have no hesitation, for the reasons above indicated, in holding it void.    But, does it, upon any sound principle of construction, apply to him at all?    It is a fundamental principle of the common law, that a statute shall be construed prospectively, and not retrospectively.    *Nova constitutio futuris formam imponere debet, et non præteritis.*  Bracton, lib. 4, fol. 228; 2 Inst., 292; *Gillmore* v. *Shuter*, 2 Mod., 310; *Couch* v. *Jefferies*, 4 Burr., 2460; *Osborne* v. *Huger*, 1 Bay, 179; *Calder* v. *Bull*, 3 Dall., 386; *Ogden* v. *Blackledge*, 2 Cranch, 272; *Dash* v. *Van Kleeck*, 7 Johns., 477.

The maxim in Bracton was probably taken from the civil law, where the same principle is found, that the lawgiver cannot change his mind to the prejudice of a vested right. *Nemo protest mutare consilium suum in alterius injuriam.* Dig., 50, 17, 75. Mr. Blackstone in his Commentaries treats it as a first principle, that all laws are to commence *in futuro*, and operate prospectively. 1 Com., 40. An act of the legislature ought never to be so construed as to do injustice. Lord Coke lays down the rule to be (Co. Litt., 360, a,) that acts of parliament are so to be construed, as that no man who is innocent or free from injury or wrong, shall, by a literal interpretation, be punished or endamaged.

To apply, then, this act to Mr. Quarrier's case, would be to make the legislature violate a fundamental principle of justice. But does the language of the act require such application, even if interpreted literally? Its language is: "No attorney shall be *allowed* to practice in any court *until* he shall take, in the court in which he *proposes* to practice, in addition to the oaths now required by law, the following oath," &c.

There are two senses in which these words are understood and used. The one has reference to the admission and qualification of an attorney in any particular court before he can acquire the right to practice; the other is in reference to his continuance to exercise the right to practice which he had already acquired. The former, therefore, relates to the judicial act of the court in admitting or allowing a party to become a practising attorney at its bar, and the latter to the judicial action of the court in the legal proceedings proper to be instituted and determined before a judgment of amotion from office can be rendered.

In the Code of 1860, page 699, chapter 164, section 3, in relation to the qualification and admission of attorneys, the language is: "Before each court in which he intends to practice;" and in the 4th section, the language is: "If he shall qualify at the first term," &c. It is very manifest the reference in the language above is to the admission of the

party as an attorney of thè court, and not to his continuance to practice as such.

In the present act the language is: "The court in which he proposes to practice." In both statutes the idea expressed by "intends" and "proposes," is prospective, and relates to the time of admission and the act of admission and qualification. Indeed, the attorney-general does not controvert this idea, but he goes further and maintains that the act applies not only to parties seeking admission to the bar of the court for the first time, but also to those who, having been admitted, shall continue to exercise the ʻprivilege acquired by the admission. Whether this act is to be applied in the one only, or in both of these senses, is an important inquiry. The language of the act clearly imports the former, but the court is left to ascertain the latter by construction. On first impression the words, "allowed to practice," in the first part of the act, might be supposed to be broad enough to embrace both senses. But it is manifest, that this word "allowed," in the fore part of the sentence, refers to the same person who "proposes to practice" in the latter part of it. It is coextensive with it, but may not be extended beyond it, without the aid of other words clearly indicative of such an enlarged sense, and no such words are to be found in the act. It would be very reprehensible to enlarge the operation of a statute by construction to divest vested rights; and the more especially so if the act might clearly operate prospectively independently of such construction. To apply this act then to Mr. Quarrier's case, would be to make it retroact; would make it violate a fundamental principle of the common law; would make it divest a vested right, without compensation; would make it repugnant to the constitution, and reflect upon the legislature, who were under the same solemn sanctions to support the organic law. Since no ground is shown for a rule or information against him for cause, which was not made at the time of his application, and admission to practice as an attorney in this court, I think the objection to his

practising in this court, without taking the said oath, ought to be overruled, and his right to practice here recognized and accorded, until a proper case be made to authorize his disbarment. This court having decided in his case that to have borne arms against the United States, for which he had been pardoned, was not cause for debarring him from admission to its bar, would not likely, I imagine, decide the same act to be now cause for disbaring him.

But whether, if a case were made in proper form, finding that an attorney of this court had, before his dismission, borne arms against the State, &c., it would be cause for disbarring him, it will be time enough to determine when such a case arises; it is not necessary now to do so, since the facts before the court present no such case, and I prefer to express no opinion on a point not in the case.

It is said, however, that this construction of the act conflicts with the views expressed in the case of *Hunter and others*, in relation to the case of those attorneys who had been admitted as attorneys of this court before the passage of the act. But there is a very marked difference in the two cases. In that case there was no moral impossibility, nor even conscientious scruple to prevent the parties from taking the oath, if it was in the power of the legislature to pass the act as to them. In this case, it is not possible for the party to take the oath required without committing an act of moral turpitude, and subjecting himself to the liability of punishment. In that case the act did not operate to deprive the parties of their vested rights. In this case it does; and that makes a most material difference.

There is another consideration which should not be overlooked in considering this subject, and that is, that the subject most earnestly pressed upon the attention of the court, and which constituted the main question considered on that branch of the case was, whether the legislature, (on the assumption that the act embraced Messrs. Lamb and Boggess, who had been admitted to practice before the

act, and who could take the oath and were ready to do it, but who denied the power of the legislature to pass a retrospective law requiring them to take any additional oath than what they had taken when they were admitted and qualified), had the power to pass the act in question as to them; and the power of the legislature was sustained, and I still think rightly so. But the question of the construction of the act was not the subject which received the careful consideration of one of the judges at least, and should not preclude a reconsideration of any matters passed *sub silentio*, whenever a proper case may arise requiring it. This view is also strengthened by the practical exposition of an act of like import, by all the officers of the government, legislative, executive and judicial. I mean the act of November 16th, 1863, requiring all persons elected or appointed to any office, "before proceeding to exercise the authority or discharge the duties" of the same, to take the test oath therein prescribed. The language of this act is as comprehensive as the act prescribing the attorneys' test oath, and as susceptible of a retrospective construction, but none such was ever given to it. If it had, then would the judges of this court, exercising the authority and discharging the duties of their offices, have been required to requalify and take the test oath; but none ever did. The same would have been true of all the other judges in the State; so also of the governor and other executive officers; so also of the members of the very legislature that passed the act. Yet it is confidently believed that in no single instance was the like ever done; and as actions speak louder than words, the practical exposition of the one act as prospective so universally adopted, should only not be overlooked or disregarded in giving construction to the others of like character and import, and upon the same subject, and for the same object.

I proceed next to consider the case of Mr. Fitzhugh, which, as before stated, so far as it appears to the court for consideration, is perhaps in every essential particular, the

same with the case of Mr. Quarrier as it appeared to the court when his case was considered and determined at the January term, 1866. See *Quarrier's case*, 2 W. V. Rep., 569. It differs, however, from Mr. Quarrier's case here, in that Mr. Fitzhugh has never yet been admitted as an attorney of this court, and now makes this motion for that purpose for the first time, after the passage of the act of February 14th, 1866. This motion is based on the ground that the said act is *ex post facto* as to him, and therefore void.

The act was passed pending the existence of a state of civil war, involving very serious consequences, no less than the existence of the State and the liberties of the people. The act, like others of like character which preceded it, had for its object the public safety by guarding the offices of the government, and the courts, from the influence and control of those who were enemies in that war, and not for the purpose of creating offences or punishing offenders. That was done by other statutes. The State had a right to defend herself, and secure her safety, and this act was a means to that end, deemed necessary and proper by the legislature. The wisdom and policy of the measure belonged to the legislative department of the government, and are not the proper subjects for judicial inquiry. The validity of the act is the only thing with which we here have to deal; that is questioned, as depriving parties who engaged in the rebellion, and were therefore enemies, of vested rights, as inflicting after punishment for previous acts, and that without trial. But, it would seem to be a very pertinent inquiry, what rights have enemies as such? Whether rebels in war have all the rights of enemies, it is not necessary here to consider, but, surely it cannot be maintained successfully, by any law, but force, that an enemy in war has a right to hold office or practice as an attorney in the courts of the State he is seeking, as such public enemy, to destroy. Neither can it be questioned that it is competent, in a state of war, for a State to confiscate the property of her enemies, and to declare the forfeiture of their privileges derived from

her authority, and to perpetuate their disabilities, so declared, as long as she shall deem it necessary and proper to the public safety and general good. *Kirk* v. *Smith*, 9 Wheat., 241. Such a right in an enemy would be incompatible with the relation of the parties. It would violate the precept of holy writ, "Ye cannot serve two masters." It would subvert the principles of the Virginia bill of rights, that governments are instituted for the benefit of the governed, and ought to be guarded against mal-administration. It would be to repeat the folly of the doves in the fable, who chose the kite for their king.

When gentlemen, whether officers of State or officers of court, adhered to and joined in the rebellion, they must be supposed to have counted the cost, and took the chances of the consequences. Whether, in so doing, they abdicated or forfeited their former offices, it is not necessary to discriminate, but one thing is quite certain, their right to exercise the functions of those offices ceased, when their character of enemies began. Reason, necessity, and force, the very nature and fitness of things alike produce this result in harmony with the law. It is likewise in harmony with the spirit of the declaration of the convention of loyal people of Virginia in June, 1861, which, after setting forth the deplorable condition of the commonwealth, and the impending dangers to the liberties of the people by the acts of the officers and enemies of the State, declared the offices vacated; and then proceeded to vindicate and restore the government in its constitutional relations to the people and the Union, by the appointment of friends instead ef enemies to execute the offices so vacated; and thus wielded the powers of government in the interests of the loyal people, instead of against them.

It would seem that the constitutional convention of 1861, which framed the constitution of the State of West Virgina, did not recognize the right of enemies to hold office or vote, if the earnest and solemn address, published by that body to the people, urging the adoption of the constitution, may

be taken as indicating its views on the subject, in which it was asked with a clearness and confidence in keeping with the time and the occasion: "Are we expected to seek the approbation of those who have disfranchised themselves by their disloyalty?"

The same principle is announced by the American people in the Declaration of Independence, where it is said of the British king: "He has abdicated government here by de-"claring us out of his protection, and waging war against "us." To the same import is the preamble of the Virginia constitution of June 23d, 1776. And upon this same principle rests the action and policy of President Johnson and the congress of the United States, in reorganizing and reconstructing the governments of the States, whose officers and citizens assumed, and for a time maintained, the character of enemies. If authority were necessary, without invoking the elementary writers on National law, it is sufficient to refer to a few only of the decisions of the courts which stand unquestioned. In the case of *Brown* v. *The United States*, 8 Cranch, 110, it was held that by the *jure belli:* "War gives the right to confiscate the property of the enemy." In the case of *Read* v. *Read*, 5 Call, 209, Judge Roane said: "Besides this ordinary and manifest right of forfeiture, there is, as I have before said, an extraordinary one accruing to belligerent nations, of confiscating the property of their enemies. * * * It is not carried into effect by the ordinary course of municipal laws. The property is seized and confiscated by an extraordinary act of the government of the belligerent nation. It is seized, not because it is the property of an alien, but of an enemy. The right is technically and properly denominated a right of confiscation."

The statute books of Congress and of the States are full of laws of this character. Such was the Virginia act of 1779, which, after reciting that by the Declaration of Independence, the residuary subjects of the British empire became enemies and aliens to the State, enacts that all the property

lying within the Commonwealth, belonging at that time to any British subject, &c., shall be deemed to be vested in the Commonwealth, and a subsequent clause describes who shall be deemed British subjects within the meaning of the act.

"The passage of this act," (says Roane, J., in *Read* vs. *Read*), "*ipso facto* confiscated the property therein contemplated; and the only enquiry necessary to be made, or which, in fact, was made, under the act, as respects the proprietor of the land, was whether he were a British subject or not, within the meaning of the act; there was no other inquiry whether he was, by law, an alien. The act was emphatically an extraordinary act of confiscation." And such, also, is the act of Nov. 13th, 1863, of this State, which not only set forth the facts which induced it, but declared who were enemies of the State, and also confiscated their estates, real and personal.

Now, if it be competent to a State to confiscate the property of its enemies, it is not perceived why it may not in like manner also confiscate or revoke the privileges, franchises, and offices derived from it before the hostile relations arose; and the more especially so if the privilege, thus withdrawn, was originally granted and subsequently continued for the public good. And the case is even stronger where the privilege in question was only granted during good behavior, and only withdrawn as a precautionary measure, to guard the public safety, when the parties had changed their relations from friends to enemies; and by their past, recent and stirring history, show an ability and disposition for mischief not believed till realized in theory and practice.

If, then, the act in question was passed pending a state of war, as is shown by the case of *Conley* vs. *Supervisors of Calhoun*, 2 W. Va. Rep., 416; and the parties whom it is alleged to punish with disability, by revoking their privileges only, were enemies, and if it was competent to a State in time of war, and of this State in like case to confiscate the property of its enemies, and revoke their privileges, it

is not perceived on what ground it can be successfully maintained that the act in question is void, either as being *ex post facto*, or as punishing without trial, or as making a party an unwilling witness against himself, because it does neither.

It is no more a punishment to exclude from the courts hostile attorneys, because they were enemies seeking the overthrow of the government, and those very courts, than it can be said to be a punishment to all citizens of the State who are excluded from the bench who have not attained the age of thirty-five years, and from Governor who have not attained the age of thirty years, and from Attorney-General and Senators who have not attained the age of twenty-five years. There is no difference in the effect. The exclusion is as much punishment in the one case as the other. They both rest on the ground of public policy, and not upon the idea or imputation of crime and punishment.

There are many things which a State may do in time of war to its enemies and their property which it may not do in time of peace. The wounded enemy on the battlefield, or on trial before a court martial, would demand in vain the guaranty of the Constitution, in the trial by jury, before he could be harmed, or his property seized and confiscated.

It is manifest, then, that, when this act passed, the enemies of the State had no right, as attorneys, in the courts, and cannot, therefore, be said to have suffered deprivation by it, and if no deprivation, then no punishment, and if no punishment, then the act could not on that account be *ex post facto*.

But suppose an enemy attorney had returned to this State and surrendered, and been pardoned and renewed his allegiance, and thus become redintegrated before the passage of the act in question; and though he might, in such case, have been admitted to the bar before the passage of the said act, if he had then applied, yet could he not do so afterwards.

Nor would any right of his in such case be thereby di-

vested, for it would be competent to the State to prescribe the terms of his return and continuance, and the conditions on which she might admit him again to enter her courts as counsellor and minister. Nor could he at any time gain admission but on condition of complying with all the laws in force, and taking all the oaths required at the time of his application. So held in *Hunter's case and others*, 2 W. Va. Rep., 122, and, as I must still believe, rightly so held.

It is also an error to suppose that the act creates a crime because it enumerates certain acts as indicative of the character of enemy. To be an enemy is not necessarily to be a criminal. On the contrary, by the *jure belli*, enemies in war are both supposed to be in the right; and it has been claimed with very great earnestness, that the rebels in the late strife were to have the benefit of the rule in all things. But it is not necessary to concede the claim nor consider it, to discriminate in the present case between the character and relations of enemy and criminal. If the acts enumerated in the act have any criminality, it arises from other laws, not from this. But because other statutes make them offences, that cannot affect the character of this act which may be said to apply to two classes of persons, viz : those who were enemies and those who were not. As regards the latter, the invalidity of the act is not urged, because inapplicable to the parties in the present motion. But as regards the former class, it is alleged that the effect of the act is to exclude them for acts which made them enemies, and thus made them *ex post facto*.

The cases of *Cummings* vs. *Missouri*, and *Exparte Garland*, 4 Wallace, have been relied on as establishing the *ex post facto* character of this act. But it is not to be overlooked that the authority of those cases is greatly weakened by the fact of the nearly equal division of the court deciding them; and viewing the balancing opinions of the two sides, I feel constrained to acknowledge that in my humble opinion, the weight of the argument is decidedly in favor of the dissenting judges.

These cases seem to me to violate the long settled principle, that *ex post facto* laws relate only to criminal, not civil matters. Blackstone, 46; 3 Dall., 386; 7 Johns, 477; 6 Cranch, 87; 12 Wheat., 266; 2 Peters, 388; 8 Peters, 88. And to call the act a criminal law is only to change the name to fit the case, without regard to its character. It makes every deprivation of a civil right a punishment, and every punishment a crime, and that completely breaks down the well defined distinction so long recognized by the repeated decisions of the courts of England and this country, both State and Federal. The distinction was plainly stated by Story, J., in *Watson* vs. *Mercer*, that "*Ex post facto* laws relate to penal and criminal proceedings which impose punishment and forfeiture, and not to civil proceedings, which affect private rights retrospectively."

In *Calder* vs. *Bull*, the supreme court said : " The true distinction is between *ex post facto* laws, and retrospective laws." Spencer, J., in *Dash* vs. *Van Kleeck*, says : " The term *ex post facto* is technical, and is to be construed according to the received and well understood meaning and import of it when the constitution was adopted. Judge Blackstone had explained the term. His work was the most popular then extant, and it was in the hands of all professional gentlemen, and of those who devoted their time and service to the State. He says : ' An *ex post facto* law is when, after an action, (indifferent in itself,) is committed, the Legislature then, for the first time, declares it to have been a crime, and inflicts a punishment upon the person who has committed it.' " He further says that two of the learned authors of the Federalist, eminent as statesmen and civilians, and who were " members of the convention which formed the constitution, agree that this definition is correct, and that it is to be so understood."

In *Calder* and *Bull*, Patterson, J., said, that the words *ex post facto*, when applied to a law, have a technical meaning, and " refer to crimes, pains, and penalties." But says he: "I had an ardent desire to have extended the provision of

the constitution to retrospective laws in general; for there is neither policy nor safety in such laws, and, therefore, I have always had a strong aversion against them."

Chancellor Kent, in his Commentaries, 1 vol., 409, says: "*Ex post facto* laws relate to penal and criminal proceedings which impose punishments or forfeitures, and not to civil proceedings, which affect private rights retrospectively. Retrospective laws and State laws divesting vested rights, unless *ex post facto*, or impairing the obligation of contracts, do not fall within the prohibition contained in the Constitution of the United States, however repugnant they may be to the principles of sound legislation."

It was upon this distinction between a retrospective civil and retrospective criminal law, that the case of *Morris* v. *Wyatt*, 2 W. Va. Rep., 575, turned, and in which this court sustained the validity of the act, because, though retrospective, it was not *ex post facto*. Recognizing this distinction, many of the States have made it a part of their organic law, that their legislatures shall not have power to pass either an *ex post facto* law or a retrospective law affecting civil rights only. But we have no such provision in the constitution of this State, and our legislature, therefore, has an undoubted power and authority to pass retrospective laws not *ex post facto*, but affecting only private rights in civil matters retrospectively, and which do not divest vested rights without just compensation, and where the object is the public safety or the general weal.

To enlarge by construction the limitations of the Federal constitution upon the reserved powers of the States, in this particular, is a matter of much more importance as a principle, than the particular case would ordinarily inspire. And it should require a clear case and an unquestioned and unquestionable authority for it, such as I do not think the judicial mind of the country has yet accepted the cases of *Cummings* and *Garland* to be. Indeed, I am at a loss to know how the majority judges who decided them, now regard it. For the case of *Hunter, Price and others*, decided by

this court after those cases were announced by the public press, was presented to that court, or the judges thereof, for review, and for a writ of error, while the whole subject was fresh in the minds of the court and the public, and the subject of criticism by the press. In that case this court held the act in question not *ex post facto.* If it was so, why did not the supreme court of the United States award the writ of error and reverse the judgment, as it did in the case of Cummings? If, as has been claimed, those cases in effect settled this case, and the authority be conclusive, why did not that court, or some of the judges who concurred in the opinion, upon the authority of those cases, give relief to the applicants, Messrs. Hunter, Price and others, by awarding the writ of error? The application was made, and was not allowed either by the court collectively, or by any of the judges separately. Again, the same question, under the same statute, soon after came before the supreme court of the District of Columbia, and was there decided in the same way as the case of *Hunter, Price and others.* I feel warranted, therefore, in concluding that the majority of the supreme court were not satisfied with the authority of those cases, so far, at least, as to the *ex post facto* character of this act, as it relates to parties circumstanced as in this case.

Mr. Garland, as appears by the report of his case, was a citizen of the State of Arkansas, and a practicing attorney in the supreme court of the United States in 1860. He embarked in the rebellion at the beginning and continued in it till the final surrender of the rebel forces, having been representative and senator in the rebel congress, which was waging a fierce war upon the Government and States of the Union. In the midst of that war, and before it culminated in any decisive issue, congress passed the act of January 24th, 1865, applying to attorneys in the United States courts the test oath deemed necessary to apply to all other public officers by the act of July 2d, 1862.

After the surrender, in July, 1865, he was pardoned by

the President, and applied to be admitted to return to his abandoned practice without regard to the act of congress. And the supreme court let him do it after first declaring the act void for the purpose.

According to the decision in the *Prize cases*, 2 Black, Mr. Garland was an "enemy" at the time of the passage of the act of January 24th, 1865, and so continued for some six months after. According to the decision of *Brown* vs. *United States*, 8 Cranch, 110, congress had a right to confiscate his estate, including his right, if it can be supposed he then had any, to appear and practice, then or at any future time, as an attorney in the Federal courts. And congress exercised that right, and passed the law.

When he surrendered and renewed his allegiance and received the executive pardon, and thus became redintegrated, he had no status as an officer and attorney in any of the courts of the Union, nor any vested right as such to appear and practice in those courts, and could only legally acquire such right by compliance with the laws in force at the time of his application renewed.

Congress, by other laws, confiscated the property of others engaged in the rebellion, and pardon did not restore them to that property. Indeed, in Mrs. Alexander's case, the war power of the government was carried so far as to confiscate the rights and property of a woman who claimed to have been no enemy, but a loyal and faithful citizen of the United States, simply because she and her property were in territory declared to be enemy territory, and she, therefore, held to be enemy. If deprivation of one's property be punishment, she was punished, not for any act of hers, but of others who raised the rebellion; and the punishment, too, was inflicted by her own government, that owed her protection, instead of the rebel. These two cases of Mrs. Alexander and Mr. Garland, the one loyal, the other disloyal; the one a friend, the other an enemy; the one entitled to protection from the government,

the other deserving its punishment, present striking and practical results of the application of principles to particular cases; and I must confess that in neither instance is my sense of justice favorably impressed with the result.

It seems to me impossible to doubt the power of congress to exclude an enemy from its courts by law, including Mr. Garland and all others, continuing enemies in rebellion from the date of the act to the end of the war, and not only so, but if congress had chosen to declare by law such continuance criminal, and punished it accordingly in express terms, it could not be avoided by calling it *ex post facto*. But if the act should go further and exclude for antecedent acts, that could not make void the law against the subsequent acts. The facts show Mr. Garland was as clearly within the prospective operation of the act by his continuance in the rebellion after its passage, as within its retrospective operation for acts antecedent to its passage. Now, his responsibility to the law prospectively for his subsequent conduct, cannot be escaped by pleading and proving that he was also guilty of antecedent acts of like character, and by the same law equally condemned, for that would be to take advantage of his own wrong, and make one fault a screen and defence for another.

Properly considered, therefore, the case of Garland in effect decides nothing more, in my humble opinion, than that a rebel attorney being pardoned by the President is thereby restored to his right to practice in the Federal courts, whether the act of congress be retrospective or prospective, or both. But inasmuch as a presidential pardon can have no such effect upon a party's standing in the State courts, that case can have no bearing on the case here.

Many of the foregoing considerations are equally applicable to the case of *Cumming* vs. *Missouri*, which seems to me to be in conflict with the decision of the supreme court of Pennsylvania, and of the supreme court of the United

States, in the case of *Butler* vs. *Pennsylvania*, and with the action of all the States in abolishing at their will, not only their governments, and establishing others in their stead, but in abolishing also the offices and emoluments of the officers that wielded them under the old forms, and limiting the qualifications of those who may enjoy like privileges under the new. It is also in conflict with the decision of the supreme court of Missouri, which it assumed to overrule, and with a subsequent case decided by that court, and since affirmed by the decision of the supreme court of the United States. It is, in my humble opinion, an unwarrantable and dangerous encroachment, under a plausible pretext, upon the reserved rights and sovereignty of the States, which the courts of the States, as oft as the case becomes the subject of review, ought to reprobate with a dignity and firmness becoming their high responsibilities. Much as I should desire to see magnanimity practiced, mercy shown, and charity extended to all, by the repeal of all laws which a changed condition make it proper to change, yet the prerogative and duty of doing it belong, not to the court, but to the people of the State, or to the legislatures thereof respectively. To pronounce what the law is or is not, is a judicial duty, but to pronounce that which is law to be not so, and that which is not, to be such, is judicial usurpation; and whether we call one judicial legislation, and the other judicial nullification, they are alike reprehensible. I have not seen the 39th volume of the New York reports containing the case of *Green* vs. *Shumway*, referred to in the argument from the newspaper statements of the case; but I have examined the written statements and extracts from the case sent me by one of the learned counsel who argued the case at bar.

As far as I can gather from the case thus presented, it would seem that the constitution of New York had prescribed the qualifications of a voter, that the act in question, in effect, added further qualifications or conditions, by requiring the party to take an oath that he had not done cer-

tain acts, which, if done before the act, would not have disqualified the voter.

Judge Miller held the act void, as being *ex post facto*, and repugnant to the constitution of the United States, upon the authority of *Cummings* vs. *Missouri*. He also held it repugnant to the constitution of New York. Judge Bacon was for affirming, on the ground that the decision of the supreme court of the United States had, in effect, decided that such an act as the one in question was in conflict with the Federal constitution, but was of opinion that no provision of the constitution of the State of New York was violated thereby. Judges Grover, Clarke and Dwight were for affirming on the ground that the act in question violated the true intent and meaning of the constitution of the State of New York; and the judges dissenting were Hunt, Mason and Woodruff.

Of these eight judges, two only seem to recognize the case of *Cummings*, and act on its authority.

Three held the act repugnant only to the constitution of New York, and a fourth held it not only repugnant to the State, but also to the Federal constitution, so that there were only four who held it repugnant to the State constitution. Three dissented from holding it repugnant to either the State or Federal constitution, and one other held it not repugnant to the State constitution, but yielded to the authority of the case of *Cummings*, as to its repugnancy to the Federal constitution; thus four also held it not repugnant to the State constitution, and only two out of the eight held it repugnant to the Federal constitution. This diversity, if not confusion of opinions in the case, shows nothing more for than against the case; shows it, indeed, worthless as an authority beyond the determination of the particular controversy between the parties to it.

Thus far I have endeavored to consider this case, uninfluenced by the opinion expressed in the case of Messrs. *Hunter, Price and others*, when the same subject was discussed with a zeal, learning, and elaboration only equalled

by the present case, and to all of which the court has lent a patient and attentive hearing.

It seems to me that the marked difference between a state of war and a state of peace, the difference between the constitutional rights of friends and enemies in such a state and condition of things, the powers, duties, and relations of the State to its friends, and towards its foes, to its citizens who are under its laws, and to its enemies who are against its laws, remove the difficulties suggested to the validity of the act in question, and relieve it of the danger to liberty, which has been, as it would seem, so much apprehended by some timid minds. To deny to the State the power to exclude its "enemies" from its offices, is to deny to it the power, and an essential means of preserving its existence. To deny to a State the power to prescribe the qualifications of its officers, is to exhibit a pitiable ignorance of what constitutes a State, and a very inadequate estimate of the power and dignity of the States of this Union. That it is competent to the legislature to prescribe the qualifications of all officers, including attorneys, except where that power is restrained by the constitution of the State, I have no doubt whatever, and I am equally confident that there is no provision prohibiting, nor intended to prohibit, the legislature from prescribing such qualifications for the office of attorney, and such tests and proofs of fitness in parties seeking admission to such office, as would effectually exclude from the courts the enemies of the State during a state of war and time of public danger, and also to continue such exclusion so long as might be deemed necessary and proper for the public security, in the wisdom and discretion of the representatives of the people. Yet, nevertheless, since the restoration of a state of peace, with all its attendant blessings, and kindly sympathies, and fraternal feelings revived and emulated among one common brotherhood, it is much to be desired that the legislature will sooner or later catch the spirit of the times and the progress of the age, and restore the favors and franchises which war's misfortunes forfeited; and that the legislature

will do so upon the sober second thought, I have as little doubt as I have that the subject is one for legislative, instead of judicial discretion.

The act of February 14th, 1866, has been criticised for its severity, whether justly so or not, it is not necessary to enquire, but the criticism has led me, as a matter of curiosity, to compare the spirit of the times, with the past, and see whether the tendency has been towards severity or leniency as regards those who have erred politically in times of severe trial. By the revised act of 1792, and the Revised Code of 1819, which continued to be the law till omitted in the revisal of 1849, all citizens who had voluntarily borne arms against the United States were prohibited from migrating to the commonwealth, and from becoming citizens thereof, and if found in the State, were to be prosecuted for a misdemeanor, and if found guilty, to be imprisoned not exceeding six months in the public jail of the commonwealth, without bail or mainprize, and fined at the discretion of the court, not exceeding 300 dollars, and stand committed until the fine be paid; and if found at large in the State after a year from the date of conviction, or a month from the time of enlargement from jail, to be thereafter imprisoned in the public jail for five years, without bail or mainprize, and forfeit all estate, real and personal; and all such persons were made equally subject to the pains, penalties, and disabilities, of the act, although they had been theretofore, or should be thereafter admitted to take the oaths of fidelity in any court of record in the same, as if they had not taken said oaths. And in any suit by them, the defendants were allowed to plead the act in bar, if the plaintiff's claim accrued in the State after the passage of the act, unless saved by the treaty of peace with Great Gritain.

Again, by an ordinance of the rebel convention at Richmond, passed May 1st, 1861, the summary arrest was authorized of any person suspected of counseling, aiding, or abetting the government of the United States or its officers in any

hostile action against the confederate states, or any of them, or any slave holding State in amity with them, or of communicating to the government of the United States or its officers, by letter or otherwise, directly or indirectly, any information touching the action of the (rebel) authorities, other than as authorized by them; and any person doing any of those things was declared guilty of felony, and punishable with fine not less than 100 dollars, nor more than 10,000 dollars, and imprisonment in the penitentiary not less than five nor more than twenty years.   And by a like ordinance, passed June 27th, 1861, it was declared that any citizen of Virginia holding office under the government of the United States after the 1st of August, should be forever banished from the State, and was declared to be an alien enemy, and so to be considered in all the courts of the State; and if any citizen should undertake to represent the State in the congress of the United States, in addition to the said penalties, he was to be deemed guilty of treason, and his property confiscated.

Now, the act of 1866, if tested by the act of 1792, and the Revised Code of 1819, or by the rebel ordinance of 1861, is certainly not more severe than they were on the unfortunate delinquent in political differences who happened to be under the ban of power, nor does it seem to me to exhibit a retrograde in humanity.

Tried by the rule of doing to others as they do to us, it is not worse than others; but tried by that higher rule, of doing to others as we would have them do to us, it certainly comes short; but as the comparison shows progress in moderation, it is to be hoped that charity will yet do its perfect work, nor wait unduly.   And it is confidently believed from the signs of the times, that the spirit of the age will require less time, to melt the hearts and restore the sympathies of the sons, than it took to soften the hearts of the sires from 1776 to 1849.

Having given to the subject the consideration due to it, and knowing that it enlists the sympathies of more

than it concerns, I have been yet unable to find cause to reverse the ruling in the case of Messrs. *Hunter, Price and others.* The motion of Mr. Fitzhugh must, therefore, be overruled.

The motion of Quarrier was overruled by Judges Berkshire and Maxwell.

The motion of Fitzhugh was unanimously overruled at a former term.