524 S.E.2d 179

STATE of West Virginia ex rel. John
F. RIST, III, Petitioner,

v.

Honorable Cecil H. UNDERWOOD, Gov-
ernor of the State of West Virginia,
and Robert S. Kiss, Respondents.

State of West Virginia ex rel. Richard A.
Robb, W. Kent Carper, Rudolph L. Di-
trapano, Roger D. Forman, Marvin W.
Masters, Anthony J. Majestro, American
Civil Liberties Union of West Virginia,
Thomas W. Pettit, Mark E. Gaydos, Carl
N. Frankovitch, Michael G. Simon,
James C. Peterson, R. Edison Hill, Har-
ry G. Deitzler, Michael C. Bee, and Nor-
man Steenstra, Jr., Petitioners,

v.

Honorable Cecil H. Underwood, Governor
of the State of West Virginia, and
Robert S. Kiss, Respondents.

Nos. 26653, 26654.

Supreme Court of Appeals of
West Virginia.

Submitted Oct. 20, 1999.

Decided Nov. 3, 1999.

Concurring Opinion of Chief Justice
Starcher Dec. 7, 1999.

John F. Rist, III, Esquire, Pro Se.

Ancil G. Ramey, Esquire, Michelle E. Piziak, Esquire, Steptoe & Johnson, Charleston, West Virginia, Attorneys for Governor Underwood.

Thomas A. Heywood, Esquire, Bowles Rice McDavid Graff & Love, Charleston, West Virginia, Attorney for Robert S. Kiss.

Sean P. McGinley, Esquire, DiTrapano, Barrett & DiPiero, Charleston, West Virginia and Lonnie C. Simmons, Esquire, Law Office of P. Rodney Jackson, Charleston, West Virginia, Attorneys for Petitioners.

Jennifer G. Walker, Esquire, Charleston, West Virginia, Attorney for Amicus Curiae Darrell E. Holmes, Clerk of the Senate.

M.E. "Mike" Mowery, Esquire, Charleston, West Virginia, Attorney for Amicus Curiae Gregory M. Gray, Clerk of the House of Delegates.

McGRAW, Justice:

This case raises the issue of whether the Emoluments Clause contained in Article VI, § 15 of the West Virginia Constitution prohibits the Governor of this State from appointing the current Speaker of the West Virginia House of Delegates as a Justice of this Court, where, during the Speaker's current term of office, the Legislature enacted a pay increase with respect to such judicial office. The Emoluments Clause at issue, Article VI, § 15, provides in pertinent part:

> No senator or delegate, during the term for which he shall have been elected, shall be elected or appointed to any civil office of profit under this State, which has been created, or the emoluments of which have been increased during such term, except offices to be filled by election by the people.

We are specifically asked to determine the meaning of the exception for "offices to be

filled by election by the people," and whether this language renders the current Speaker eligible to assume the office to which the Governor has appointed him.

Any examination of our Constitution—the organic law of our State—must proceed with utmost care and concern for the future impact of our decision. The ripples created by our interpretation of this important question will propagate far into the future of our jurisprudence. Before commencing, we note the counsel of Thomas Jefferson:

> On every question of construction [of the Constitution] let us carry ourselves back to the time when the Constitution was adopted, recollect the spirit manifested in the debates, and instead of trying what meaning may be squeezed out of the text, or intended against it, conform to the probable one in which it was passed.

Letter from Thomas Jefferson to Justice William Johnson, June 12, 1823, in *Thomas Jefferson on Constitutional Issues* (Va. Comm. on Constitutional Government 1962). With this wisdom as our watch star, we examine the provision at issue, in the context of our constitutional history, and in the context of the history of our State.

## I.

### BACKGROUND

The facts in this case are not disputed. On August 31, 1999, the Honorable Margaret L. Workman resigned as a Justice of this Court, thereby creating a vacancy that can be filled only by gubernatorial appointment pursuant to Article VIII, § 7 of the West Virginia Constitution. On September 9, 1999, respondent, the Honorable Cecil H. Underwood, Governor of the State of West Virginia, announced his decision to appoint the Honorable Robert S. Kiss, currently Speaker of the House of Delegates, to fill Justice Workman's unexpired term, which ends following the 2000 general election. On September 22, 1999, Governor Underwood notified the Secretary of State that the appointment of

Speaker Kiss as Justice of this Court would become effective, and that Speaker Kiss would begin to serve, at 12:00 a.m. on September 23, 1999.

Speaker Kiss was a member of the West Virginia House of Delegates during the 1999 legislative session.[1] During that session, the Legislature passed H.B. 105, which *inter alia* amended W. Va.Code § 51–1–10a by increasing the salary of the Justices of this Court from $85,000 to $95,000, effective July 1, 1999. *See* 1999 W. Va. Acts ch. 8. Petitioners rely upon this event in asserting that Speaker Kiss is constitutionally disqualified from serving on this Court.

After Governor Underwood publicly announced the appointment of Speaker Kiss as a Justice of this Court, and prior to the filing of the petitions in this matter, a ceremony was scheduled for September 20, 1999 for the purpose of administering the oath of office. Once the issue that is the subject of this case was publicly raised, however, Speaker Kiss canceled the swearing-in ceremony.

On September 23, 1999, John F. Rist, III, in his capacity as a citizen and taxpayer of the State of West Virginia, filed the instant petition for writ of mandamus and/or prohibition. In his petition, Rist asserts that Speaker Kiss is ineligible to serve the unexpired term created by the resignation of Justice Workman, based upon Article VI, § 15 of the West Virginia Constitution. Later, on September 29, 1999, a second petition was filed by Richard A. Robb, and others, similarly asserting that Speaker Kiss is constitutionally disqualified from serving as a Justice on this Court pursuant to Article VI, § 15. Petitioners request that this Court issue an order directing Governor Underwood to appoint a constitutionally eligible person to fill the unexpired term of Justice Workman.

After the filing of the petitions in this matter, the Court issued a rule to show cause and determined that, because the principal issue—the eligibility of Speaker Kiss to occu-

---

1. Speaker Kiss' present two-year term as a member of the House of Delegates will expire after the next general election. He will hold the position as presiding officer of the House of Delegates, however, until a successor is elected and qualified, irrespective of the results of such election. W. Va.Code § 4–1–8 (1980); *see State ex rel. McGraw v. Willis*, 174 W.Va. 118, 323 S.E.2d 600 (1984).

py the position of Supreme Court Justice— was identical in both proceedings, the two cases should be consolidated and · resolved jointly.

## II.

### STANDARD FOR MANDAMUS

 Petitioners seek to invoke this Court's original jurisdiction[2] by way of the extraordinary remedy of mandamus. Traditionally, we have confined mandamus to "limited and truly exceptional circumstances." *State ex rel. School Bldg. Auth. v. Marockie,* 198 W.Va. 424, 432, 481 S.E.2d 730, 738 (1996) (citations omitted). *Accord State ex rel. Charleston Bldg. Comm'n v. Dial,* 198 W.Va. 185, 191, 479 S.E.2d 695, 701 (1996). This Court applies a now-familiar three-part test to determine whether mandamus relief is appropriate:

> A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy.

Syl. pt. 3, *State ex rel. Kucera v. City of Wheeling,* 153 W.Va. 538, 170 S.E.2d 367 (1969).

 In Syllabus point 3 of *State ex rel. Brotherton v. Moore,* 159 W.Va. 934, 230 S.E.2d 638 (1976), the Court held that "[m]andamus lies to compel the governor to exercise his power of appointment under Section 9 of Article VII of the Constitution of West Virginia when the governor declines or fails to exercise his power for an unreasonable period of time." The Court in *Moore* noted that "[w]hile mandamus cannot be used to compel the choice of a particular individual, it can be used to compel the exercise of the appointive power." 159 W.Va. at 941, 230 S.E.2d at 642. Rather than seeking the appointment of a particular individual, however, petitioners effectively request the Court to compel Governor Underwood to ex-

ercise his appointive responsibilities in conformance with the constitutional requirement set forth in Article VI, § 15. For the purposes of the instant case, there is no significant distinction to be drawn between an appointment that is unreasonably delayed, and an appointment that contravenes constitutional requirements. Consequently, in line with our conclusion in *Moore,* mandamus will lie to resolve the question of whether a gubernatorial appointee is constitutionally qualified to assume the office to which he or she has been appointed.

Although petitioner Robb seeks to invoke this Court's mandamus jurisdiction, he nevertheless argues that we should apply the jurisprudential doctrine of ripeness to avoid passing on the issue presented. Robb's ripeness argument appears to be grounded upon the fact that Speaker Kiss purports to still be a member of the House of Delegates, and thus, according to petitioner's argument, the issue of eligibility has not matured into a controversy suitable for our adjudication because the Governor's appointee has not assumed office.

 We concur with petitioner Robb's underlying assumption that one may not hold judicial and legislative offices at the same time. This is a fundamental tenet of the separation of powers doctrine contained in our Constitution:

> No person holding any other lucrative office or employment under this State, the United States, or any foreign government; no member of Congress; and no person who is sheriff, constable, or clerk of any court of record, shall be eligible to a seat in the legislature.

W. Va. Const. art. 6, § 13; *see also* W. Va. Const. art. V, § 1. Additionally, no Justice of this Court may hold any other office: "No justice, judge or magistrate shall hold any other office, or accept any appointment or public trust, under this or any other government." W. Va. Const. art. 8, § 7.

---

**2.** Petitioner Rist relies upon the statutory mandamus remedy provided by W. Va.Code § 3–1–45 (1963) ("A mandamus shall lie from the supreme court of appeals ... to compel any officer herein to do and perform legally any duty herein re-

quired of him"), rather than the original jurisdiction of this Court. Without passing upon whether such remedy is appropriate in the present context, we treat Rist's claim for relief under the Court's original jurisdiction.

We have found in other cases that, where the prompt resolution of a controversy was necessary for the efficient operation of our government, arguments may be heard by this Court, although the ultimate outcome of a given question may remain inchoate.

When considering the question of whether former Governor Moore could seek a third term of office in the elections of 1976, the Governor's counsel argued that mandamus was an improper remedy. Although the technical nature of that argument differed from the instant matter, we recognized this Court's power, and obligation, to act, even though it was still theoretically possible that Governor Moore would lose the election and render moot the question of his eligibility for a third term:

> [T]his Court has recognized that some form of proceeding must be available by which interested parties may challenge in advance of a primary or general election the eligibility of questionable candidates in order to assure that elections will not become a mockery.

*State ex rel. Maloney v. McCartney,* 159 W.Va. 513, 527, 223 S.E.2d 607, 616 (1976). We recognized in a later case:

> Experience dictates that there are occasions on which courts must undertake something in the nature of advisory opinions. We have done this in cases involving elections because of the expense attendant upon campaigns and the deleterious effect on representative government which uncertainty in elections causes. *State ex rel. Maloney v. McCartney,* [159] W. Va. [513],

223 S.E.2d 607 (1976). Similarly we have rendered essentially advisory opinions when it was necessary to permit bond counsel to authorize the marketing of bonds for public authorities. *State ex rel. City of Charleston v. Coghill,* 156 W.Va. 877, 207 S.E.2d 113 (1973). The need for certainty before the investment of enormous amounts of human effort and before the investment of vast sums of money has led us to an *ad hoc* reappraisal of the common law requirement of a true adversary "case or controversy" as a condition precedent to court review.

*State ex rel. Alsop v. McCartney,* 159 W.Va. 829, 834–35, 228 S.E.2d 278, 281 (1976).

■ In the case before us today, it is clear that the Governor has appointed Speaker Kiss to fill (if eligible) the vacancy on this Court, and that no other person stands in the same position as the current appointee. Because of the importance of this issue—to this Court, the Legislature, and the public at large—we consider the present question ripe for adjudication.

## III.

## DISCUSSION

■ There can be no debate concerning the reach, and effect, of the basic prohibition contained in Article VI, § 15, as it provides a straightforward and absolute bar against a member of the Legislature obtaining any public office that was created, or the emoluments of which were increased, during the legislator's term of office.[3] What is at issue

---

**3.** In what appears to be a veiled portent of things to come, Governor Underwood alludes in his brief to the possibility of the Legislature's negating the effect of the Emoluments Clause by repealing the underlying judicial pay increase, or enacting legislation reducing the compensation of Speaker Kiss to the salary in effect immediately prior to the most recent increase. Other state courts have rejected such devices. *See Vreeland v. Byrne,* 72 N.J. 292, 297, 370 A.2d 825, 827 (1977) (striking down as special legislation measure providing that pay increase for associate justice would not apply to member of legislature appointed to such position); *cf. State ex rel. Fraser v. Gay,* 158 Fla. 465, 470, 28 So.2d 901, 903 (1947) (holding that appointee "cannot avoid the constitutional prohibition by remitting the

raise in salary for the period of this election to the legislature").

Both courses suggested by Governor Underwood would clearly run afoul of the Emoluments Clause, since there is no provision permitting the Legislature to annul operation of the rule by later decreasing the emoluments of an office. As one commentator has noted in the context of Congressional legislation aimed at circumventing the federal Emoluments Clause, "[a] statute cannot repeal history; it cannot undue the fact that the emoluments of the office *had been* "increased" during the [legislator's term of office]...." Michael Stokes Paulsen, *Is Lloyd Bentsen Unconstitutional?,* 46 Stan. L.Rev. 907 (1994) (emphasis in original) (contending that the appointment of Senator Bentsen as Treasury Secretary violated the Emoluments Clause); *see also* John F. O'Con-

in this case is the meaning to be ascribed to the exception regarding "offices to be filled by election by the people." Speaker Kiss and Governor Underwood argue that this language broadly excepts offices that are elective in nature—in effect contending that the Emoluments Clause never applies to an office that will be subject to popular election at some future date. On the other hand, petitioners assert that the exception applies only to the more narrow circumstance of where a legislator is, in fact, elected by the people to a particular office. We begin our analysis with a detailed examination of the history of the constitutional provision at issue, and then turn to the more difficult task of ascertaining the meaning of the exception clause.

## A.

### History and Context of the Emoluments Clause in Virginia and West Virginia

#### 1. The Emoluments Clause in Antebellum Virginia.

The forerunner to Article VI, § 15 of the present West Virginia Constitution was enacted by the Virginia General Assembly in 1794. 1794 Va. Acts ch. 22, 1 *Statutes at Large of Virginia* 306 (Richmond, Samuel

Shephard 1835).[4] The wording of the 1794 provision was taken almost verbatim from Article I, § 6, cl. 2, of the United States Constitution,[5] which was submitted for ratification by the states just seven years before.

The emoluments prohibition was given constitutional status with the adoption of the Virginia Constitution of 1830.[6] Significant for present purposes was the insertion in the 1830 provision of an exception for "offices as may be filled by elections by the people." The records of the constitutional convention shed no light, however, on the intended meaning of this language, as the provision was adopted without amendment or debate. *See Proceedings and Debates of the Virginia State Convention of 1829–1830* 40, 460–61, 804–5 (Richmond, S. Shepherd & Co. 1830).

The Framers of the 1830 Constitution would have understood the Emoluments Clause as primarily imposing a check on legislative corruption. A contemporary interpretation offered by Justice Story[7] indicated that the purpose behind the federal provision was "to take away, as far as possible, any improper bias in the vote of the representative, and to secure to the constituents some solemn pledge of this disinterestedness." Joseph Story, *Commentaries on the Constitution of the United States* § 867, at 330–31 (Cambridge, Hilliard, Gray & Co.,

---

nor, *The Emoluments Clause: An Anti–Federalist Intruder in a Federalist Constitution*, 24 Hofstra L.Rev. 89 (1995). The former dean of the West Virginia College of Law astutely observed in testimony before Congress that such rescission measures "smack[] of clever manipulation," and makes the provision "the subject of deft maneuver." *To Reduce the Compensation of the Office of Attorney General: Hearings on S. 2673 Before the Comm. On the Judiciary*, 93d Cong., 1st Sess. 43 (1974) (statement of Dean Willard D. Lorenson).

**4.** This 1794 enactment provided:

That no senator or delegate, shall during the time for which he was elected, be appointed to any civil office under the authority of the Commonwealth, which shall have been created, or the emoluments whereof shall have been increased or decreased during such time.

**5.** The Emoluments Clause of the United States Constitution provides as follows:

No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the

United States, which shall have been created, or the Emoluments whereof shall have been increased during such time . . . .

**6.** Article III, § 8 of the Virginia Constitution of 1830 provided:

The members of the assembly shall receive for their services a compensation to be ascertained by law and paid out of the public treasury; but no law increasing the compensation of the members shall take effect until the end of the next annual session after such law shall have been enacted. And no senator or delegate shall, during the term for which he shall have been elected, be appointed to any civil office of profit under the commonwealth, which shall have been created, or the emoluments of which shall have been increased, during such term, except such offices as may be filled by elections by the people.

**7.** Justice Joseph Story, of Massachusetts, served on the United States Supreme Court from 1812 to 1845. Appointed by President Madison, Story was the youngest person, at age 32, ever appointed to the Court.

1st ed. 1833).[8] In addition to protecting the public fisc from collusive and self-serving conduct by legislators, the Emoluments Clause was also recognized as playing a crucial role in maintaining separation of powers. Alexander Hamilton succinctly observed that the Emoluments Clause "guards against the danger of executive influence upon the legislative body." *The Federalist* No. 76 at 459 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Madison likewise noted that this provision was intended to limit the potential of the executive using its appointive power to corrupt the Congress:

> Is there a danger apprehended from the other branches of government? But where are the means to be found by the President, or the Senate, or both? . . . . The only means, then, which they can possess, will be in the dispensation of appointments. Is it here that suspicion rests her charge. Sometimes we are told that this fund of corruption is to be exhausted by the President in subduing the virtue of the Senate. Now, the fidelity of the other House is to be the victim . . . . . But, fortunately, the Constitution has provided a still further safeguard. The members of the Congress are rendered ineligible to any civil offices that may be created, or of which the emoluments may be increased, during their term of election. No offices therefore can be dealt out to the existing members but such as may become vacant by ordinary casualties . . . .

8. Justice Story went on to say:
It is not easy, by any constitutional or legislative enactments, to shut out all or even many of the avenues of undue or corrupt influence upon the human mind. The great securities for society—those on which it must forever rest in a free government—are *responsibility to the people through elections*, and personal character and purity of principle. Where these are wanting there never can be any solid confidence or any deep sense of duty. Where these exist they become a sufficient guaranty against all sinister influences, as well as all gross offenses.
Story, *supra*, § 865, at 332 (emphasis added).

9. James Madison participated in the drafting of the federal Emoluments Clause, and was also a leading figure in the convention that produced the 1830 Virginia Constitution.

10. Article IV, § 10 of the Virginia Constitution of 1851 provided:

*The Federalist* No. 55 at 345 (James Madison).[9] Indeed, George Mason even went so far as to state that the provision provides "the corner-stone on which our liberties depend." 1 *The Records of the Federal Convention of 1787* 381 (remarks of George Mason) (Max Farrand ed., 1911).

The Emoluments Clause was retained in the Virginia Constitution of 1851, although the exception language was truncated to "offices filled by elections by the people."[10] While this alteration suggests an intent to clarify that popular election was the only means of abating the impediment imposed by the Emoluments Clause, the proceedings of the constitutional convention do not indicate an intent to work any substantive changes on the provision. The Committee on the Legislative Department, which was charged with drafting the article of the constitution dealing with the legislative branch of government, reported the provision to the Committee of the Whole without recommending any alterations to the language employed in the 1830 instrument. Likewise, no amendments to the section were recommended by the Committee of the Whole, nor was there any debate concerning any proposed changes. *See Journal, Acts and Proceedings of the General Convention of the State of Virginia, Assembled at Richmond, on Monday, the Fourteenth Day of October, Eighteen Hundred and Fifty* 330–357 (Richmond, W. Culley 1850).[11]

The members of the assembly shall receive for their services a compensation to be ascertained by law, and paid out of the public treasury; but no act increasing such compensation shall take effect until after the end of the term for which the members of the house of delegates voting thereon were elected. And no senator or delegate shall, during the term for which he shall have been elected, be appointed to any civil office of profit under the commonwealth, which shall have been created, or the emoluments of which have been increased, during such term, except offices filled by elections by the people.

11. The fact that the Framers of the Constitution of 1851 did not intend to substantively alter the provision in question does not necessarily support the notion that the exception was meant to broadly exempt all offices elective in nature. Indeed, the fact that the drafters of this later constitution made significant deletions without any

*2. West Virginia During Reconstruction.*

The Emoluments Clause of preceding Virginia constitutions was not incorporated into West Virginia's first constitution, which was ratified in 1863. Rather, it was inserted in its present form—with only minor modifications to the language employed in earlier Virginia constitutions—in the Constitution of 1872.

The architects of our 1872 Constitution, who restored this provision, were no doubt influenced by the Reconstruction era.[12] The contentious history of the State's creation, forged in the crucible of the Civil War, is well known; the stories of brother fighting brother, of counties and communities torn apart, are familiar to all. What must also be recalled in addressing the issue before the Court in the instant case, is the impact that the conditions prevailing at that time had on the shaping of our present Constitution.

A hallmark of the Reconstruction era was the failure of democratic institutions to preserve the peace, and a concomitant weakening of the people's faith in those institutions. The decisive events in our early history—the First Wheeling Convention of May 1861, the Second Wheeling Convention of June 1861, the referendum on our separation from Virginia, and the selection of delegates to the First Constitutional Convention of West Virginia—all failed to draw a truly democratic and full accounting of the will of the people. Close examination of any of those votes re-

veals very "undemocratic" results concealed beneath a veneer of popular democracy. An elected representative to the first Constitutional Convention, a Mr. Hagar of Boone County, remarked upon the unsatisfactory way in which the delegates were selected:

> "If ... Cabell County, which borders on the Ohio River, had to have a military force to hold an election there; if Boone had to have a military force to hold an election at two points [out of the usual eight]; if a detachment went up and ... got into a corner of Raleigh and held an election there, with what difficulty are the counties represented!"

James C. McGregor, *The Disruption of Virginia* 268–269 (1922).[13] Much the same could be said of the eventual adoption of the first Constitution of this State by the people, which "was adopted by the suspiciously large majority of 20,442 to 440." Richard Orr Curry, *The Virginia Background for the History of the Civil War and Reconstruction Era in West Virginia: An Analytical Commentary,* 20 W. Va. History 215, 244 (1959) (noting that Greenbrier, Logan, McDowell, Mercer, Monroe, Raleigh, and Wyoming Counties never reported returns for or against the first Constitution).

Ardent Unionists, firmly in control of the legislature of the new state they had created, wished to ensure that former rebels were punished for their crimes and kept far from the rudder of the ship of state. This senti-

recorded intent to substantively change the provision can certainly be construed as suggesting a then-existing acceptance of the exception clause as requiring popular election. *See* 1 A.E. Dick Howard, *Commentaries on the Constitution of Virginia* 486 (1974) (noting that Emoluments Clause of 1830 Constitution "except[ed] offices filled by popular election," and "saw only minor changes [in Virginia] until 1902....").

**12.** Indeed, some states were moved by the experiences of Reconstruction to altogether eliminate the exception for popular elections. As the Florida Supreme Court recounted in *State ex rel. West v. Gray,* 74 So.2d 114, 117 (Fla.1954):

[A]t that time [of amendment], the people were just emerging from the reconstruction period following the War Between the States; they still bore the scars of Carpetbag Rule; the memories of the political abuses suffered thereunder were still fresh in their minds; and we

can well surmise that they intended to prohibit "trafficking" in public offices, both elective and appointive, from which they had suffered during that regime.

**13.** Other historians have commented upon this. Rice and Brown note that Webster and Monroe Counties sent no delegates at all to the First Constitutional Convention, and war-time disturbances interfered with the vote in Calhoun, Clay, Fayette, Logan, McDowell, Mercer, Nicholas, and Wyoming Counties. Otis K. Rice & Stephen W. Brown, *West Virginia, A History* 140–41 2d ed. (1993). "For instance, Dr. D.W. Gibson of Pocahontas County was elected [to the convention] by refugees at Buckhannon in Upshur County." *Id.* at 141. Furthermore, Wyoming and Fayette Counties never even held elections to select delegates, but were instead represented by delegates who came to the convention bearing petitions signed by residents of their counties. McGregor, *supra,* at 258.

ment manifested itself in the form of the "test oath" or "loyalty oath" that became mandatory for a host of occupations.[14] The oath was designed by those in power, and loyal to the Union, to prevent any ex-Confederate from participating in government. This was made clear in the remarks of one James H. Fergueson, of Cabell County, the author of the bill that required the oath: "I do not want the rebels to have any share in government. If they do I shall be defeated by five hundred votes." Milton Gerofsky, *Reconstruction in West Virginia*, 6 W. Va. History 295, 302 (1945) [hereinafter *Reconstruction I*] (quoting Charles H. Ambler, *Disfranchisement in West Virginia*, 14 Yale Rev. 38 (1905)) (internal quotation marks omitted).

This Court examined the "test oath" in the context of an election for circuit clerk. William Stratton, a former Confederate, was elected Circuit Clerk of Logan County. When he refused to take the oath, the circuit judge would not qualify him for office. He requested that this Court issue a writ of mandamus on the basis that the oath was unconstitutional. This Court denied the writ, explaining:

Our legislature possessing all the legislative power of the State, it follows that it was competent for it to pass the act prescribing the test oath in question. . . .

. . . .

The provision in my judgment, is not retrospective nor *ex post facto.* No one having a natural or inalienable *right* to an office, it follows that all who seek it must accept the office with all the restrictions and conditions imposed by law.

*Ex parte William Stratton*, 1 W.Va. 305, 306–7 (1866).[15]

The Legislature demanded, and this Court upheld, oaths for jurors, *Lively v. Ballard*, 2 W.Va. 496 (1868); lawyers, *Ex parte Hunter*, 2 W.Va. 122 (1867); *Ex parte Quarrier*, 4 W.Va. 210 (1870); *Ex parte Charles James Faulkner*, 1 W.Va. 269 (1866); litigants or potential litigants, *Higginbotham v. Haselden*, 3 W.Va. 17 (1868); and even voters in public elections, *Randolph v. Good*, 3 W.Va. 551 (1869).

Another way in which the oath was used to inflict punishment on ex-Confederates, was by denying them justice in the courts. Many ex-confederates were sued, had their land taken, or suffered other loses of money or property, and were more often than not, denied redress. Because the plaintiffs, lawyers, every member of the jury, and the judge all had to take the "test oath" before the trial, and were all presumably "loyal" as a result, unfavorable outcomes for "disloyal" defendants were the order of the day. *See, e.g., Cunningham v. Pitzer*, 2 W.Va. 264 (1867) (jury found against ex-Confederate defendant for aiding the Confederate army in the confiscation of the plaintiff's wheat); *Ca-*

14. The oath read as follows:

I, A.B. (name of affiant) do solemnly swear that I have never voluntarily borne arms against the United States, the reorganized government of Virginia, or the State of West Virginia; that I have never voluntarily given aid, comfort or assistance to persons engaged in armed hostility against the United States, the reorganized government of Virginia, or the State of West Virginia; that I have not at any time sought, accepted, exercised, or attempted to exercise any office or appointment whatever, under any authority or pretended authority, hostile or inimical to the United States, the reorganized government of Virginia, or the State of West Virginia; that I have not at any time yielded a voluntary support to any government or pretended government, power or constitution within the United States, hostile or inimical thereto, or hostile or inimical to the reorganized government of Virginia, or the State of West Virginia; that I will support the

constitution of the United States and the constitution of the State of West Virginia; and I take this oath freely without any mental reservation or purpose of evasion.

1865 W. Va. Acts ch. 56.

15. The Legislature of 1869 unseated a representative of Wyoming County, John McCraw (a forbearer of a member of this Court), on the basis of the oath. The voters of the sixth delegate district chose McCraw in the election of 1868. Although the House Journal of January 19, 1869, indicates that McCraw had taken the necessary oaths and qualified for office, Delegate Smith of Kanawha County, on January 21, 1869, introduced the petition of one William Roach, who sought McCraw's removal. On February 2, 1869, the House voted to remove McCraw, 35 to 16, resolving that "John McCraw, the sitting member from the sixth delegate district, is not entitled to his seat in this House. . . ." *Journal of the House of Delegates of the State of West Virginia*, 7th Sess., 46–47 (1869).

*perton v. Martin,* 4 W.Va. 138 (1870) (pro-Union plaintiff sued ex-Confederate defendant for false imprisonment for his capture and captivity during the war and won $600 in damages); *French v. White,* 4 W.Va. 170 (1870) (another false imprisonment case, similar to *Caperton*). It is apparent from these cases that the Legislature used the "test oath" to disenfranchise a substantial portion of the electorate.[16]

This situation prevailed until the elections of 1869 and 1870, where the Democrats (including many ex-confederates) gained substantial power in the Legislature. Then, in August of 1871, West Virginians voted 30,220 to 27,658 in favor of a constitutional convention. The convention assembled at Charleston, which had become the capital by 1870, with only twelve Republican delegates (dubbed the "twelve apostles"), and with United States Senator Waitman T. Wiley, of Morgantown, as the only holdover from the First Constitutional Convention. *See* Milton Gerofsky, *Reconstruction in West Virginia,* 7 W. Va. History 5, 13–15 (1945) [hereinafter *Reconstruction II* ].

The upshot of this discussion is that the men who drafted the 1872 Constitution, and who reinserted the Emoluments Clause as contained in previous Virginia constitutions, came from this background and lived in these times; the events of those days were fresh in their memories when they forged our present Constitution. Preventing the abuses and self-dealing of the "carpetbaggers" of the Reconstruction period must have been fore-

most in their minds.[17] And so we, today, bear in mind this history as we consider the question before us.

### B.

### *Construction of the Election Exception*

██ "The fundamental principle in constitutional construction is that effect must be given to the intent of the Framers of such organic law and of the people who ratified and adopted it." *State ex rel. Brotherton v. Blankenship,* 157 W.Va. 100, 108, 207 S.E.2d 421, 427 (1973); *see also State ex rel. Mountaineer Park, Inc. v. Polan,* 190 W.Va. 276, 279, 438 S.E.2d 308, 311 (1993). Accordingly, our analysis in this case begins with the language of Article VI, § 15. *See Randolph County Bd. of Educ. v. Adams,* 196 W.Va. 9, 15, 467 S.E.2d 150, 156 (1995); *Polan,* 190 W.Va. at 283, 438 S.E.2d at 315 (stressing that "[a]s in every case involving the application or interpretation of a constitutional provision, analysis must begin with the language of the constitutional provision itself"). "Where a provision of a constitution is clear in its terms and of plain interpretation to any ordinary and reasonable mind, it should be applied and not construed." Syl. pt. 3, *State ex rel. Smith v. Gore,* 150 W.Va. 71, 143 S.E.2d 791 (1965); *see also* Syl. pt. 1, *State ex rel. Maloney v. McCartney,* 159 W.Va. 513, 223 S.E.2d 607 (1976). Importantly, at this stage of interpretation, "[c]ourts are not concerned with the wisdom or expediencies of constitutional provisions, and the duty of the judiciary is merely to carry out the provi-

---

**16.** For more discussion of the disenfranchisement suffered by those citizens who sympathized with the Confederacy, see *Reconstruction I, supra,* at 349–352.

**17.** As an example of the evil they sought to prevent, one may examine the story of Judge Nathaniel Harrison of what was then the 7th Judicial Circuit, which encompassed Greenbrier, Nicholas, Monroe, and Pocahontas Counties—an area that was substantially pro-Confederate during the war. Among various abuses, Judge Harrison ejected all former Confederates from office, even though they had been popularly elected in the elections of 1865; enforced the "test oath" and "forfeiture" acts relentlessly; demanded that all legal ads be placed in a paper that he owned; suggested parties use a particular lawyer, from whom Harrison received a percentage of the fees; sat in cases in which he, himself was an

interested party; and charged cash for approving pardon applications for ex-Confederates. *See Reconstruction II, supra,* at 13–15.

When a former Confederate officer sought Harrison's impeachment in the House of Delegates in February of 1866, members or staff of the House beat him, ejected him from the chamber, and called his formal request for Harrison's impeachment "a paper which was deemed by this House a malicious attempt to publicly slander one of the Circuit Judges of this State." *Journal of the House of Delegates of the State of West Virginia,* 4th Sess., 115 (1866). Others attempted to remove Harrison from office, but he managed to hold on to his position until the Legislature of 1870 adopted articles of impeachment against him. *Reconstruction II, supra,* at 13–15.

sions of the plain language stated in the constitution." Syl. pt. 3, *State ex rel. Casey v. Pauley,* 158 W.Va. 298, 210 S.E.2d 649 (1974).

In this case, we fail to discern any unequivocal meaning from the wording of the exception language. Reasonable persons can easily disagree as to the scope of the phrase, "offices to be filled by election by the people." We are not the first court to recognize ambiguity in such a provision: The Supreme Court of California long ago recognized the ambiguity inherent in similar language contained in the California Constitution of 1849, stating that the inclusion of such an exception

> had the effect of injecting doubt and uncertainty as to limitation thereby placed upon the operation of the language which preceded it. Did the exception mean that the language preceding it should not apply to the appointment of a legislator who should run and be elected to another elective office during the term for which he had been elected a member of the senate or general assembly? Or did the exception mean that the prohibition should not apply to the appointment of a legislator to an elective office, that is, an office normally filled by election by the people?

*Carter v. Commission on Qualifications of Judicial Appointments,* 14 Cal.2d 179, 182–83, 93 P.2d 140, 142 (1939).

 "Questions of constitutional construction are in the main governed by the same general rules applied in statutory construction." Syl. pt. 1, *Winkler v. State School Bldg. Auth.,* 189 W.Va. 748, 434 S.E.2d 420 (1993). Because the exception clause of Article VI, § 15 is ambiguous, "ordinary principles employed in statutory construction must be applied to ascertain such

intent." *Blankenship,* 157 W.Va. at 108, 207 S.E.2d at 427. Of course, "[t]he object of construction, as applied to written constitutions, is to give effect to the intent of the people in adopting it." Syl. pt. 3, *Diamond v. Parkersburg–Aetna Corp.,* 146 W.Va. 543, 122 S.E.2d 436 (1961).

Respondents assert that because the Emoluments Clause restricts an individual's right to hold public office, it must be construed in favor of eligibility. In support of this argument, respondents cite to *State ex rel. Maloney v. McCartney, supra,* where this Court stated in syllabus point 3, in part, that "[i]n the event of ambiguity a constitutional amendment will receive every reasonable construction in favor of eligibility for office ...." According to Governor Underwood, "[o]nly where a constitutional provision clearly and unambiguously precludes a gubernatorial appointment may such appointment be invalidated by the judiciary."[18] We reject this standard in the present context.

 While "a strong public policy exists in favor of eligibility for public office," *Oceanographic Comm'n v. O'Brien,* 74 Wash.2d 904, 914, 447 P.2d 707, 712 (1968), in this case we are faced with the competing consideration of maintaining a constitutionally-mandated separation between the executive and legislative branches of government. Again, the Emoluments Clause is aimed not just at eliminating self-dealing on the part of legislators; rather, it is also intended to forestall even the remotest possibility of executive influence over the legislature. The Emoluments Clause is therefore part of our rigorous system of interbranch separation of powers, ancillary to the fundamental directive set forth in Article V, § 1 of the West Virginia Constitution.[19]

**18.** Speaker Kiss similarly argues that "unless this Court concludes that the exception in question unambiguously fails to exempt elective offices from the general prohibition of the Emoluments Clause, fundamental jurisprudential considerations mandate a ruling in favor of the viability of the appointment and the eligibility of the appointee to office."

**19.** Article V, § 1 provides:
The legislative, executive and judicial departments shall be separate and distinct, so that

neither shall exercise the powers properly belonging to either of the others; nor shall any person exercise the powers of more than one of them at the same time, except that justices of the peace shall be eligible to the legislature.
The Emoluments Clause is therefore closely related to Article VI, § 13 of the West Virginia Constitution, which prohibits a member of the Legislature from "holding any other lucrative office or employment under this State, the United States, or any foreign government...."

■ As we stated in syllabus point 1, in part, of *State ex rel. Barker v. Manchin,* 167 W.Va. 155, 279 S.E.2d 622 (1981), the doctrine of separation of powers "is part of the fundamental law of our State and, as such, it must be strictly construed and closely followed." *See also In re Dailey,* 195 W.Va. 330, 333, 465 S.E.2d 601, 604 (1995) (stating that "[t]he commitment of this Court to a strict application of the doctrine of separation of powers ... [has] been unwavering."); *State ex rel. Meadows v. Hechler,* 195 W.Va. 11, 14, 462 S.E.2d 586, 589 (1995) ("The separation of powers doctrine expressly stated in our constitution is a core principle of our system of government....").

■ Petitioner Robb is correct in pointing out that we are not concerned in this case with the right of an individual to stand for *election* to public office, which this Court has stressed is a "fundamental right" that can only be infringed upon by a showing of "compelling state interest," *White v. Manchin,* 173 W.Va. 526, 543, 318 S.E.2d 470, 488 (1984); instead, we are faced with the question of whether an individual who has already been elected to (and assumed) a position in the Legislature may thereafter be *appointed* to another governmental post during an existing term of office. Under these circumstances, where the dangers comprehended by the Emoluments Clause are so readily apparent, we fail to discern any overarching public policy favoring eligibility. We therefore reject respondents' argument that the Emoluments Clause of Article VI, § 15 should be strictly construed in favor of eligibility.

In support of their basic argument that the exception language in Article VI, § 15 exempts legislators who are appointed to offices that are elective in nature (rather than offices affirmatively "filled by election by the people"), respondents point to two cases from Alabama and California. In these cases, the courts held that because the constitutional prohibition pertains exclusively to "appointments," the exception must be construed to relate to the nature of the appointed office if it is to have any significant meaning.

The Supreme Court of Alabama concluded in *Opinion of the Justices,* 279 Ala. 38, 38–39, 181 So.2d 105, 106–107 (1965), that

> [i]f the section ended just before the word "except," no member of the Legislature could ever be *appointed,* during his term, to any office created by the Legislature of which he was a member. But the words, "except such offices as may be filled by election by the people" must have some meaning. The only reasonable conclusion is that excepted from the rule of Section 59 is an appointment to an office which "may be filled by an election by the people."

(Emphasis added.) Likewise, in *Carter v. Commission on Qualifications of Judicial Appointments,* 14 Cal.2d 179, 93 P.2d 140 (1939), the California Supreme Court concluded as follows:

> If the section as originally adopted had any other meaning than the exception removed elective offices from the operation of the prohibitory clause, the inclusion of the exception was meaningless and surplusage, for the section would then mean that legislators were ineligible for appointment except when they obtained their offices by election. *There is, of course, a well-defined and fundamental difference between the acquisition of an office by appointment on the one hand, and by election on the other....* Some meaning must be ascribed to the excepting clause and when we seek to ascertain it, the reasonable, if not the only logical conclusion is that the exception had the effect of describing the kind and character of the offices thereby removed from the operation of the prohibitory clause and not the method which the offices were to be filled.

*Id.* at 186, 93 P.2d at 142 (emphasis added).[20]

■ This Court has traditionally adhered to the rule that "if possible, effect should be given to every part and to every word of a constitutional provision and that, unless there is some clear reason to the contrary, no part of the fundamental law should be regarded as surplusage." Syl. pt. 2, in part, *Diamond v. Parkersburg–Aetna*

---

**20.** Significantly, the emoluments provisions contained in the California Constitutions of 1849 and 1879, which were a major focus in *Carter,* pertained singularly to the eligibility of a legislator to be "appointed" to a civil office.

*Corp., supra.* In this case, however, Article VI, § 15 proscribes *election* as well as appointment to office. The exception language of our Constitution can therefore be construed as requiring popular election without rendering it meaningless—*i.e.*, the exception clause pertains to a class of election, "election[s] by the people."

Respondents' argument becomes more persuasive, however, when we consider the earlier Virginia constitutions upon which Article VI, § 15 was based. The Virginia Constitutions of 1830 and 1851 merely proscribed "appoint[ment]," rather than election to office. Thus, at first blush, the rationale of the Alabama and California supreme courts would appear applicable.

A distinction between the terms "elected" and "appointed" was recognized in this jurisdiction as early as 1866, when Judge Harrison noted in dissent: "The term 'elected,' generally speaking, imports popular election. The term 'appointed' excludes that idea and refers the office or trust to some other source." *Ex Parte Faulkner,* 1 W.Va. 269, 298–99 (1866) (Harrison, J., dissenting). However, the Virginia Constitution of 1830 apparently did not employ these words as mutually exclusive terms. For example, while the instrument used the term "appoint" to refer to the General Assembly's act of selecting the attorney general and officers of the militia (above the rank of brigadier general), it described the comparable power of the legislature to select the governor and various judges in terms of "elect[ing]."

Other courts interpreting early state constitutions have made similar observations in concluding that the term "appointed" can be broadly read as encompassing the word "elected." In *State ex rel. Wagner v. Compson,* 34 Or. 25, 54 P. 349 (1898), the Oregon Supreme Court, in interpreting its state constitution, observed that

> "The word 'appoint' was probably used as a more comprehensive term, to convey the idea of a mode of constituting or designating an officer, whether by election or otherwise. In fact, the words 'elect' and 'appoint' seem to have been regarded as synonymous by the convention." The word "elect" simply means to pick out, to select from among a number, or to make choice of, and is synonymous with the words "choose," "prefer," "select," and it was evidently used in this sense in the constitution.

> While the words "elect" and "appoint" are not ordinarily synonymous, we think a careful examination of the language of our constitution will show that, in some instances, the framers of that instrument have used them as such.

34 Or. at 32–33, 54 P. at 351 (quoting *People ex rel. Aylett v. Langdon,* 8 Cal. 1 (1857)). *See also Wagner v. City of San Angelo,* 546 S.W.2d 378, 379 (Tex.Civ.App.1977) ("[T]he term "appointment" appears to be used in this section [of the statute] as a more comprehensive term, to convey the idea of a mode of constituting or designating the head of the department, whether selected by appointment, election, or otherwise.") (citing *Compson, supra*).

The insertion of the word "elected" into the West Virginia Constitution of 1872 may properly be viewed as merely clarifying the intent of the original Framers of the provision in question. Consequently, we find no merit in respondents' argument that the exception language of Article VI, § 15 would be rendered nugatory or meaningless when construed as requiring *de facto* popular election.

Given the long history of the emoluments clause in our jurisdiction, we are drawn back to the Virginia Constitution of 1830, where the exception language at issue today was first included. A frequently relied upon canon of construction is that statutes relating to the same subject should be construed together as far as possible to determine legislative intent: "Statutes which relate to the same subject matter should be read and applied together so that the Legislature's intention can be gathered from the whole of the enactments." Syl. pt. 3, *Smith v. State Workmen's Compensation Comm'r,* 159 W.Va. 108, 219 S.E.2d 361 (1975); *see* Syl. pt. 3, *Boley v. Miller,* 187 W.Va. 242, 418 S.E.2d 352 (1992). The same rule applies, of course, with equal force when discerning the intent of framers of constitutions. *Blankenship,* 157 W.Va. at 108, 207 S.E.2d at 427.

Not only did Article III, § 8 of the Virginia Constitution of 1830 contain an emoluments clause essentially indistinguishable from that which we construe today, it also provided in the very same section that "no law increasing the compensation of the members shall take effect until the end of the next annual session after such law shall have been enacted."[21] The striking aspect of the compensation clause is that it effectively required an intervening popular election *before* any increase in pay could take effect.

Viewing the Emoluments Clause in the context of this closely-related provision, it would be unreasonable to conclude that the Framers of the 1830 Constitution (or the drafters of later constitutions) on the one hand intended to expose legislative pay increases to prior electoral scrutiny, but on the other hand nevertheless acquiesced in permitting legislators to obtain similar gain through non-elective appointments to office. Our jurisprudence abhors such illogic. *See State v. Kerns,* 183 W.Va. 130, 135, 394 S.E.2d 532, 537 (1990) (recognizing "duty of this Court to avoid whenever possible a construction of a statute which leads to absurd, inconsistent, unjust or unreasonable results"); *State ex rel. Simpkins v. Harvey,* 172 W.Va. 312, 321, 305 S.E.2d 268, 277 (1983) (citing earlier cases).

Consideration of the 1830 Virginia Constitution is not an idle academic exercise. The constitutional restriction on the Legislature's ability to vote itself an immediate pay increase survived until the latter part of this century. The requirement that any legislative pay raise be preceded by a popular

election was carried over into Article IV, § 10 of the Constitution of 1851.[22] The first West Virginia Constitution, ratified in 1863, went even further by specifying the rate of pay for legislators—effectively requiring a constitutional amendment to implement any increase in compensation. *See* W. Va. Const. of 1863, art. IV, § 33. This approach was also employed in Article VI, § 33 of the 1872 Constitution. As we recognized in *State ex rel. Holmes v. Gainer,* 191 W.Va. 686, 690, 447 S.E.2d 887, 891 (1994), "[t]his constitutional requirement made it extremely difficult to get a legislative compensation constitutional amendment to increase legislative salaries passed with any frequency by the voters." Only two pay increases (in 1920 and 1954) were passed by constitutional amendment prior to 1970, when the section was substantially rewritten to place the responsibility for initiating pay increases in the hands of an independent citizens legislative compensation commission.

The notion that the Emoluments Clause is part of a broader design to provide the electorate with an advance opportunity to pass upon potentially self-serving increases in compensation is also bolstered by reference to constitutional provisions pertaining to executive pay. The 1863 West Virginia Constitution prohibited any increase or decrease in compensation during a public officer's term of office. W. Va. Const. of 1863 art. III, § 9.[23] This prohibition remains operative in Article VI, § 38 of our present Constitution.[24] The Court previously discussed at length the purpose underlying this provision:

> No extra compensation shall be granted or allowed to any public officer, agent, servant or contractor, after the services shall have been rendered or the contract made; nor shall any legislature authorize the payment of any claim or part thereof, hereafter created against the State, under any agreement or contract made, without express authority of law; and all such unauthorized agreements shall be null and void. *Nor shall the salary of any public officer be increased or diminished during his term of office,* nor shall any such officer, or his or their sureties be released from any debt or liability due to the State: Provided, the legislature may make appropriations for expenditures hereafter incurred in suppressing insurrection, or repelling invasion.
>
> (Emphasis added.) *See also* W. Va.Code § 6-7-7 (1923).

---

21. See note 6, *supra,* for the text of Va. Const. of 1830, art. III, § 8.

22. See note 10, *supra,* for the text of Va. Const. of 1851, art. IV, § 10.

23. A similar provision was contained in the 1830 Virginia Constitution, which provided that the governor's compensation "shall be neither increased nor diminished during his continuance in office." Va. Const. of 1830, art. IV, § 3; *see also* Va. Const. of 1851, art. V, § 4 (specifying gubernatorial salary and directing that such officer "shall receive no other emoluments from this or any other governments").

24. Article VI, § 38 of our present Constitution provides:

The command of the Constitution that the salary of no public officer shall be increased or diminished during his term of office, is a wise and salutary mandate. Its purpose is to establish definiteness and certainty in the salaries of public officers and to protect and safeguard the independence, the security, and the efficiency of the occupant of every public office. It assures the people that those who serve them as public officers shall give their services during their terms for the amount of compensation for which they were willing to serve and have been selected, and for which they were expected by the people to serve at the time of their entrance upon the performance of their duties. It prevents attacks upon officials by those who may be possessed, at any time, of the means and the will to influence or control their course of conduct through added income at public expense; and *it removes the possibility of increasing in that manner the financial burden of the people by those who possess and exercise the power of government and the authority of public office.* The benefits which result from the operation of this provision of the Constitution promote sound and orderly administration of government, and this provision may not be dispensed with, circumvented, or ignored.

*Harbert v. County Court of Harrison County*, 129 W.Va. 54, 62–63, 39 S.E.2d 177, 185 (1946) (emphasis added); *see also Delardas v. County Court of Monongalia County*, 155 W.Va. 776, 781, 186 S.E.2d 847, 851 (1972). As Professor Bastress notes, this provision "provides a measure of independence and protection for public officials because they will not be influenced by the promise of a raise or the threat of a salary decrease. Conversely, the section prevents those in positions of power in the government from using that power to extract unreasonably high salaries." Robert M. Bastress, *The West Virginia State Constitution* 164 (1995). With respect to the latter purpose, the ultimate check as to elective officers comes from the fact that this provision ensures an intervening popular election *prior* to the implementation of any increase in compensation.

To construe the exception language of Article VI, § 15 in the manner suggested by respondents would thus require that we ignore the broader constitutional scheme intended by the Framers. The fact that a vital part of that design—the limitation on the Legislature's ability to increase its pay without an express or presupposed referendum—has since been altered by constitutional amendment, does not diminish the considerable force that these antecedent provisions bring to bear in construing the Emoluments Clause at issue. Indeed, it is well established that "when an article has two distinct sections dealing with related matters, amendment[] to one section is not an amendment to the others because it is presumed that if the legislature had intended an amendment to apply to both sections it would have expressed such an intent." 1A Norman J. Singer, *Sutherland Statutory Construction* § 22.34, at 298 (5th ed.1991) (footnote omitted).

Our reading of the language of Article VI, § 15 is further strengthened when we consider the experiences of the drafters of our present Constitution, who reintroduced the Emoluments Clause into the organic law of this jurisdiction. The abuses that occurred during Reconstruction, which resulted most notably from a lack of popular accountability, must surely have moulded the thinking of the Framers of the 1872 Constitution, such that they would have intended that true, representative democracy would hold sway whenever possible. Our construction of the provision in question faithfully takes those motivations into account.

■■■ Consequently, we hold that Article VI, § 15 of the West Virginia Constitution, with one exception, renders a member of the Legislature ineligible to be elected or appointed to a civil office for profit in this State, which has been created, or the emoluments of which have been increased, during the legislator's term of office. We also hold that the exception for "offices to be filled by election by the people," operates to allow an otherwise ineligible legislator to gain public office through popular election. In effect, only a vote of the people can overcome the

impediment imposed by the Emoluments Clause. In light of such holding, we are compelled to grant the mandamus relief sought by petitioners.

We must stress, however, that the holding in this case does not pose a significant obstacle to otherwise highly qualified persons gaining appointive office. Importantly, the provision in question applies only to a legislator's current term of office. Upon the expiration of such term, a legislator again becomes eligible for appointment to civil office.[25] Moreover, the Emoluments Clause places no disability whatsoever on a legislator who gains office through election by the people. Thus, we fail to see how our conclusion today will have any serious negative impact upon the ability of members of the Legislature to later serve the people of this State.

## IV.

## CONCLUSION

For the reasons stated, we grant the relief requested by petitioners, and issue a writ of mandamus requiring respondent, Governor Cecil H. Underwood, to discharge his duty under W. Va. Const. art. VIII, § 7 by appointing an individual to the office of Justice of the Supreme Court of Appeals who is constitutionally qualified to hold such office, and who is not barred from such service by operation of Article VI, § 15 of the West Virginia Constitution.

Writ of mandamus, as moulded, granted.

Justice DAVIS, deeming herself disqualified, did not participate in the decision in this case.

Retired Justice MILLER, sitting by temporary assignment.

Judge CLARENCE L. WATT, sitting by temporary assignment.

MAYNARD, Justice, dissenting:

With the majority decision, this Court has attacked both the Legislature and the Governor with a sledgehammer. I, for one, do not believe that they will take it lying down. This decision will have far-reaching and long-lasting consequences for the entire judicial branch of government in West Virginia for many years to come.

Every eighth grade West Virginia civics student understands our system of checks and balances. When one branch of government becomes arrogant in its use of power, the system of checks and balances provides a remedy. In plain language, when one branch behaves like barracudas, another branch "reels 'em" in. In this case, the majority has stripped the Governor of his power of appointment and denied members of the Legislature their right to hold certain public offices. I fear the outcome will be grave.

This decision amounts to nothing less than a judicial Pearl Harbor. Japanese Admiral Isoroku Yamamoto is quoted as saying about the United States right after the attack, "I fear all we have done is awaken a sleeping giant and fill him with a terrible resolve." To continue the metaphor, that is precisely what this Court has done to the Legislature of West Virginia. This Court cannot continue to thumb its nose at the other branches of government. The Legislature and the Governor will not stand by and continue to allow this Court to usurp their constitutional powers. I genuinely fear that the Legislature will now be "a giant filled with a terrible resolve." There is already talk in the press that the Legislature may attempt to make changes in the budget making power of the Court. I fervently hope that does not occur. But some effort to exercise checks and balances on this Court's power will surely be attempted. That effort could even result in a fundamental change in the way we select judges in this State. In fact, many West Virginia lawyers and several state newspa-

**25.** In this respect we note that the restriction of the Emoluments Clause is more short-lived than what is imposed upon a broad class of public officials by the West Virginia Governmental Ethics Act, W. Va.Code ch. 6B. For example, the prohibition against a former public official appearing in a representative capacity before a governmental entity in which he or she previously served extends for six months *after* the term of public service has ended. W. Va.Code § 6B–2–5(g)(1) (1995).

pers have already advocated radical changes in the judicial selection process. Some urge merit selection for judges and others support nonpartisan elections. The minority opinion in The Final Report of the Commission on the Future of the West Virginia Judiciary recommends the merit selection of judges. It would not surprise me if there was a movement to adopt the Virginia system wherein judges are selected by the Legislature. While it is impossible to predict what specific changes will come about as a result of this decision, make no mistake, changes are coming.

Aside from the many negative practical effects of this decision, a few of which are set forth above, the majority is wrong about the law. First, the majority ignores clear constitutional language. Article VI, Section 15 of our Constitution prohibits a senator or delegate from being elected or appointed to a civil office of profit during the same term in which the civil office was created, or its emoluments increased, "except offices to be filled by election by the people." Thus, this provision expressly excludes publicly-elected offices from its prohibition. It is undisputed that the office of justice of the supreme court of appeals is constitutionally established as a publicly-elected office or one to be filled by election by the people. Article VIII, Section 2 of the Constitution provides, in relevant part, that "[t]he justices shall be elected by the voters of the State for a term of twelve years, unless sooner removed or retired as authorized in this article." Delegate Kiss fits within the exception to the prohibition contained in Article VI, Section 15 because he was appointed to the office of justice which is an office to be filled by election by the people. The office does not temporarily shift from being an elective office to being an appointive office merely because a seat is vacated which must be filled until the next election.

Second, the majority opinion is wrong because it disregards our precedential authority which states that when we consider the constitutionality of an executive appointment, there is a strong presumption in favor of eligibility. As noted above, I believe the language of Article VI, Section 15 is clear.

Even if it is not clear, however, the respondents should prevail. Our law states that "[i]n the event of ambiguity a constitutional amendment will receive every reasonable construction in favor of eligibility for office[.]" Syllabus Point 3, *State ex rel. Maloney v. McCartney,* 159 W.Va. 513, 223 S.E.2d 607 (1976). This is because the governor's power of appointment, within constitutional limits, is plenary. Also, the valuable right of a citizen to hold public office should not be denied except by plain provisions of the law. In the instant case, Governor Underwood used his authority under Article VIII, Section 7 of the Constitution to appoint Speaker Kiss to fill a vacancy of this Court. During oral argument, the petitioners in case No. 26654 acknowledged that Article VI, Section 15 is susceptible of two different interpretations. Accordingly, we should construe any ambiguity in Article VI, Section 15 in favor of Speaker Kiss's eligibility for office as plainly required by well-settled law. Instead, the majority does the opposite and construes an ambiguity manufactured by these petitioners in favor of ineligibility.

Third, the majority opinion is wrong because it ignores the persuasive authority of other states. Courts which have considered this issue under state constitutions with similar provisions have ruled that such provisions do not prohibit the gubernatorial appointment of members of the legislature to a judicial office where the members of such judicial office are subject to public election. The constitutions of nine other states have constitutional provisions similar to our own which exempt offices to be filled by election by the people. *See* Ala. Const. Art. IV, § 59; Cal. Const. Art. 4, § 13; Ind. Const. Art. 4, § 30; Iowa Const. Art. 3, § 21; Ky. Const. § 44; Me. Const. Art. 4, Pt. 3, § 10; Miss. Const. Art. 4, § 45; Nev. Const. Art. 4, § 8; and Or. Const. Art. IV, § 30. In *Opinion of the Justices,* 279 Ala. 38, 181 So.2d 105 (1965) and *Carter v. Commission on Qualifications of Judicial Appointments,* 14 Cal.2d 179, 93 P.2d 140 (1939), the supreme courts of Alabama and California concluded that a legislator may be appointed to an office which is normally filled by election by the people. The Supreme Court of Alabama opined:

If the section ended just before the word "except," no member of the Legislature could ever be appointed, during his term, to any office created by the Legislature of which he was a member. But the words, "except such offices as may be filled by election by the people" must have some meaning. The only reasonable construction is that excepted from the rule of Section 59 is an appointment to an office which "may be filled by an election by the people."

*Opinion,* 279 Ala. at 39, 181 So.2d at 107. Likewise, the Supreme Court of California explained:

If the section as originally adopted had any other meaning than that the exception removed elective offices from the operation of the prohibitory clause, the inclusion of the exception was meaningless and surplusage, for the section would then mean that legislators were ineligible for appointment except when they obtained their offices by election.... Some meaning must be ascribed to the excepting clause and when we seek to ascertain it, the reasonable, if not the only logical conclusion is that the exception had the effect of describing the kind or character of the offices thereby removed from the operation of the prohibitory clause and not the method by which the offices were to be filled.

*Carter,* 14 Cal.2d at 186, 93 P.2d at 144. I believe this reasoning is right on point and should have been adopted by this Court.

What truly astonishes me about the majority opinion is the fact that it is so empty of legal support. The majority admits that "[t]he records of the constitutional convention shed no light ... on the intended meaning of [the language of Article VI, Section 15], as the provision was adopted without amendment or debate." The majority then proceeds, however, to discern the thoughts and intentions of a disparate group of Framers from 1872 despite the nonexistent records. For example, the majority finds that the Framers of the 1830 Constitution "would have understood the Emoluments Clause as primarily imposing a check on legislative corruption." On what does the majority base such a claim? The majority also concludes

that the alteration in the 1851 Virginia Constitution "suggests an intent to clarify that *popular election was the only means* of abating the impediment imposed by the Emoluments Clause" even though "the proceedings of the constitutional convention do not indicate an intent to work any substantive changes on the provision." Further, opines the majority, "[t]he architects of our 1872 Constitution ... were no doubt influenced by the Reconstruction era." Were they really? In what way were they influenced? In addition, we are informed by the majority that "[p]reventing abuses and self-dealing of the 'carpetbaggers' of the Reconstruction period must have been foremost in the[Framers'] minds." Again, asserts the majority, "[t]he abuses that occurred during Reconstruction, which resulted most notably from a lack of popular accountability, must surely have molded the thinking of the Framers[.]" I wish I had been invited to the seance, or had access to the majority's crystal ball, so that I too could have engaged in enlightening dialogue with the 1872 Framers.

Seriously, though, the language of this decision, such as "would have understood," "suggests," "were no doubt," "must have been," "must surely have," points to the simple fact that the majority was guessing. Finding a complete lack of legal support for its desired result, the majority made up history out of whole cloth. For thirty-seven pages the majority raises the specter of carpetbaggers and the evil of the reconstruction era, wholly irrelevant to the instant case, only to reach the conclusion that the writ is granted because the majority does not want Speaker Kiss on this Court. Finally, the majority fails to see how its conclusion will have any serious negative impact upon the ability of members of the Legislature to later serve the people of the State. Well, let me tell you how.

Every member of the Legislature should be appalled and furious when they realize that this decision has effectively denied each of them one of the most basic rights of all Americans—the right to hold certain public offices. But it goes much further than that. Now, when the Legislature votes for *any* increase in emoluments applicable to all state

employees, regardless of how small the increase, delegates and senators are disqualified from appointment to all state offices during that term. In other words, if the Legislature votes the slightest increase to state employees in health coverage, or retirement benefits, or vacation benefits, or travel expenses, or per diem pay, all delegates and senators are now barred from appointment to any other state position which becomes vacant during that same term. The door to judicial and executive branch positions has been slammed shut to legislators for a significant period of time after any increase in emoluments. This is true even of those legislators who vote no on any increase! For example, no delegate can be appointed to any vacant senate seat following a legislative pay raise, or *any* increase in legislative per diem, or *any* emolument. This is just one small illustration of the brutal impact of this decision on legislators. There are many more but to list them all would cut down a small forest.

Also, this decision will have an awful effect on all our circuit judges. One of my main priorities as a member of this Court has been to preserve and enhance the authority, independence and discretion of the office of Circuit Judge. This means guarding the rights of circuit judges both on the law side and the administrative side of courts, which includes preserving judges' tenure in office, improving salary and benefits, and providing adequate support staff and equipment. I hope this decision does not portend failure in this important goal, but I fear that it does.

In addition, the majority has done a grave disservice to Speaker Kiss. This decision is the political mugging of a good man. Speaker Kiss is an able man of great integrity and intellect, respected and honored by his peers in State government and in the legal profession. He has a sharp mind and a big heart. He would be a superb judge. Sadly, he has been robbed of his legitimate right to sit on this Court.

Finally, aside from legal considerations, there is real irony in this decision. At the outset, I am not suggesting by this comment that cases should be decided based on such factors. This is merely an observation, noth-

ing more. It has nothing to do with the law. The observation is thus: some members of this Court argued the case and demonstrated the need for a judicial pay raise for all judicial officers during the 1999 legislative session. Some of the same members of this Court have now voted to deny to a member of that same Legislature his legal right to sit on this Court because of that very pay raise. What irony! What chutzpah!

Tragically, people today in West Virginia and across the country have lost confidence in the American court system. The decision in this case is a perfect example of the reason why. The majority has taken the simple, plain language of a clear constitutional provision and twisted it beyond all recognition in order to achieve its own ends. With this decision, the majority abandons the sure foundation of settled law; ignores plain constitutional language; rejects the authority of the Governor to fill vacancies on this Court; usurps the power of the Legislature; and disregards precedential and persuasive authority. The consequences are troubling. We are subjected to a legal opinion bereft of sound legal precedent and supported only by the majority's own spurious reasoning. This decision is on par with that of Captain Smith to go full steam ahead on that frigid night in 1912 when he steered the Titanic. Therefore, I dissent.

I am authorized to state that Justice MILLER joins me in this dissent.

STARCHER, Chief Justice, concurring:

(Filed Dec. 7, 1999)

I.

*Pouring Gasoline on the Fire*

I am truly upset by the dissenting opinion. I have never read an opinion by a member of this Court that compared the opinion of fellow justices to a cruel act of human slaughter, like the Japanese attack on the United States of America at Pearl Harbor. In fact, I don't think I've ever seen such a vicious comparison in a judicial dissent—anywhere.

Tension between this Court and the other branches of government is not new. It is the Court's job to interpret the *West Virginia*

*Constitution,* and almost every year or two, we are required to stand in the way of some action by the executive or the Legislature because their actions have violated the *Constitution.*

There are two ways to react to the sparks that inevitably fly when this Court has to say "no" to an action by the executive or Legislature. One way is to try to understand the proper role of the Court, and to keep the discussion on a respectful and civil plane.

The other way to react is to do what the dissent has done—to pour gasoline on the flames!

It does not serve anyone for a judicial officer to invite dissension and open warfare between the judicial branch of government and other branches. Nor does mean-spirited ridicule of the majority's reasoning process serve any purpose. By exaggeration, misstatement, and inflammatory rhetoric, the dissent fuels and fans the flames of discord. This is just what our state does *not* need.

## II.

### *Getting the Job of Being A Judge*

It is people who vote who ultimately give our court system its legitimacy as an independent branch of government, protective of the rights enshrined in our laws and *Constitution.*[1]

When it comes to deciding who will get to hold the powerful job of being a judge (or justice, or magistrate), we have used popular elections in West Virginia for more than 125 years. This system has by all accounts served us well.[2]

Unlike some states, we don't ordinarily hand out our judging jobs in West Virginia in a back-room swap, trade, or deal—in the governor's office or in the Legislature—even to highly qualified candidates. We require our judges, *before* they get the job and exercise power, to stand publicly for election, and to receive the direct approval of the people.

When there is a vacancy between judicial elections, we make an exception. The governor selects the person who gets the job until the next election. Not surprisingly, when this "appointment exception" to judicial selection kicks in, the role of the electorate is diminished, and the role of the politicians is enhanced.[3]

But there are some restrictions on who is eligible for such appointment to office. In

1. *See* Appendix A, Larry V. Starcher, "Judicial Selection in West Virginia," Volume 12, Number 3, *West Virginia Lawyer,* October 1998.

2. The forces of money and power are always opposed to the popular election of judges. These forces fund so-called "good government" campaigns against the popular electoral system for judicial selection. While any system for selecting judges has its negatives, the basic arguments against judicial elections are in fact well-refuted by research comparing the electoral and appointed approaches. "Good government" arguments against the popular election of judges are in large measure a rhetorical cover-up for the fact that it is easier for the rich and powerful (who are a numerical electoral minority) to affect and control who does and does not become a judge, when the selection is by means other than popular election. (*See* Starcher, *supra.*)

3. Political decisions are quite American. Creating and giving people jobs and raising salaries is a normal (and legal) part of what has historically been central to the operation of the legislative and executive arenas. Consider, for example, the "Budget Digest," a mechanism whereby millions of dollars for local projects and jobs are annually passed out like holiday gifts by the West

Virginia legislative leadership. This mechanism has been severely criticized by one of the dissenters in the instant case:

> What a true laboratory of horrors the majority has concocted with this lineage of back-room documents that will transform what was originally pronounced as dead and having no force and effect of law into something alive. The Igors of the world may rejoice at the majority's concoction. I do not, because it takes the legislative process out of the clear light of day where matters are voted on by the entire legislature and condemns it to that subterranean realm where memoranda of negotiations, compromises, and agreements exist and discussions in committee are used to validate the specific expenditure of funds through the Budget Digest.

*Common Cause of West Virginia v. Tomblin,* 413 S.E.2d 358, 401, 186 W.Va. 537, 580 (1991). (Miller, J., dissenting).

To adopt the dissent's approach in the instant case, and to permit legislators who create or raise the salary of jobs to then take and hold those jobs without first obtaining popular approval, would surely furnish the "laboratory of horrors" with the raw materials of even more un-democratic concoctions.

the case of a gubernatorial appointment to a judge's job (or any other public job), our *West Virginia Constitution*—and the *United States Constitution,* and the constitutions of almost all other states—say that legislators are *ineligible* for the job—if the job was created or the pay for the job was increased during the term that the appointment to the office is to be made.

These constitutional limitations are "Emoluments Clauses," or "Legislative Ineligibility Clauses." *See* John F. O'Connor, "The Emoluments Clause: An Anti–Federalist Intruder in a Federalist Constitution," 24 Hofstra L.Rev. 89, 91 n. 2 (1995).

The legislative ineligibility clauses in our federal constitution and dozens of state constitutions *absolutely* bar legislators from eligibility for offices that were created or had the pay increased during the legislator's term. Most of these clauses make no exception whatsoever for popular election to such an office. Somehow the dissent loses sight of this elementary point.

This strict ineligibility for legislators is not a diabolical invention of this Court, directed at Speaker Kiss. It is a central fixture of our American governmental system.

For example, in 1793, George Washington had to withdraw his nomination of William Paterson to the United States Supreme Court because Paterson had been in the Senate when the office of Associate Justice was created. *Id.* at 105. I suppose that according to the dissent, President Washington was like Admiral Tojo!

West Virginia (and about nine other states) have in their constitutions some sort of a "popular election exception" to the "legislator ineligibility rule." Our state's "popular election" exception, Article VI, Section 15 of the *West Virginia Constitution,* is the constitutional clause that is at issue in the instant case.

To summarize, then, here is how a person gets the job of judge or justice in West Virginia:

(1) the general rule for deciding who gets the judging jobs in West Virginia is this: the people decide, through popular elections;

(2) if there is a vacancy in a judicial office, there is an "appointment exception" to the rule that the people decide;

(3) however, there is a constitutional rule that makes legislators ineligible to hold any job during a particular term during which they were involved with creating the job or improving the salary of the job; and

(4) there is a "popular election" exception to this "legislative ineligibility rule," so that such a legislator may hold an office during a term in which he was involved in creating the job or improving the salary of the job, *if* the people override the ineligibility through an election, even during the particular term.

### III.

#### *The Benefits of Incumbency*

I have gained my judicial jobs through popular election on four occasions. Twice (with the help of many people), I successfully stormed the castle from outside, as a challenger and non-incumbent. Twice I have stood on the battlements of office as an incumbent, and repelled the attempts of would-be evictors.

From this experience, I understand well the benefits of incumbency—and I might add, I earned that incumbency in elections.

Of course incumbency does not assure victory. But the significant weight that "being in office" brings to a popular electoral contest undoubtedly makes incumbency a rich asset and prize.

If—to fill a judicial vacancy—the "leg up" of incumbency must be awarded to a person who has not earned that benefit in an election, then that benefit must be awarded in adherence to the *strictest possible reading* of any applicable proscriptions and limitations. Otherwise, our democratic system for judicial selection would be distorted and unfair.

### IV.

#### *The Error of the Dissent*

The dissent does not take this approach—quite to the contrary. The dissent would allow the mere *possibility* of a future popular election to permit an otherwise ineligible leg-

islator to not only get a "free ride" on the horse of a powerful office, but also to grab the coveted "brass ring" of incumbency—all without first "paying the fare" of submitting to the will of the people in a popular election—and winning.

Under the dissent's *laissez-faire* approach to the constitutional language in question, a legislator could enjoy an otherwise prohibited office for literally years, without popular approval—if an election was in some way forthcoming.[4] In short, the position that the dissent advocates would gut the constitutional ineligibility of legislators to hold offices that they have created or for which they have improved the pay.

## V.

### *The Majority Opinion is Correct*

The majority in the instant case has staked out a position that strictly applies the constitutional legislative ineligibility rule. The majority opinion is solid and well-reasoned. The dissenting approach ignores both constitutional purpose and history.

There will always be those who cry politics in such a case—whichever way it goes. But the law is with the majority in the instant case. Accordingly, I concur with the majority decision and opinion.

And, as a footnote, I would say that it is time to let the healing begin.

## APPENDIX A

### Choosing West Virginia's Judges

by Larry V. Starcher, Justice,
West Virginia Supreme
Court of Appeals [5]

[M]any months of reading opinions from the six states canvassed here creates a strong subjective impression that a judicial vibrancy exists in West Virginia and Pennsylvania that simply is not found in Virginia and Rhode Island. As a general rule, the decisions from the legislatively selected benches are laconic, prosaic, and sterile. Contrariwise, those from the elected courts (especially West Virginia's) are vigorous and often inspiring.

Daniel R. Pinello, *The Impact of Judicial-Selection Method on State-Supreme-Court Policy: Innovation, Reaction, and Atrophy* 135, 140 n. 31, Greenwood Press, 1995.

[T]he experience of most jurisdictions with merit selection plans has not been the elimination of political considerations from judicial selection, but the substitution of some kinds of political forces by others.

Phillip L. Dubois, "Accountability, Independence and the Selection of State Judges: the Role of Popular Judicial Elections," 40 S.W.L.J. 31, 33 (1986).

For more than 125 years, West Virginians have used open, competitive and partisan elections to choose our judges—as required by our *Constitution.*

Nevertheless, in recent years it has been suggested that by eliminating judicial elections, and by adopting a purportedly "non-political" system of "merit-based" judicial appointment, we would have "better" judges, and more "dignity and respect" for our judicial system.

There are at least two perspectives that may underlie such suggestions for changing West Virginia's judicial selection process.

One perspective is the idealistic and unselfish desire to improve government for the benefit of all people. I understand, respect and appreciate this perspective. In a world of competing interest groups the sense of

---

4. The dissent has relied upon a simplistic grammatical construction, to read the relevant constitutional language as permitting this perversion of the constitutional intent. But there is, of course, an equally permissible grammatical construction that reflects a constitutional intent to require popular election before an otherwise ineligible legislator may take an office. That grammatical construction is consistent with the fact that our West Virginia constitutional language—"offices *to be* elected by the people" is mandatory—as opposed to the language in the cases relied upon by the dissent—"offices as *may be* elected by the people." The construction that the majority adopts is in accord with history and scholarship.

5. The author was elected as judge of the Seventeenth Judicial Circuit in 1976, 1984, and 1992. He was elected to the Supreme Court of Appeals of West Virginia in 1996. The author is grateful for the assistance of Thomas W. Rodd, Supreme Court Law Clerk, J.D. West Virginia University College of Law 1982, in the preparation of this article.

civic responsibility that leads people to disinterestedly work for "good government" is all too rare. We all should try to bring this perspective to our professional lives.

I am writing this article primarily to address those who value and share this "good government" perspective. It is my belief that with respect to our judiciary total appointment of our judges is not the best way to achieve "good government." Hopefully, readers will consider my points with an open mind and perhaps be persuaded by my comments.

I would also note that, in my view, there is a second perspective that is associated with calls for abolishing the popular election of judges. This second perspective is less idealistic, and is more about power, pure and simple. This perspective reflects the desire of elites to shape, orient, and control our legal system. I do not share this perspective.

Keeping these two perspectives in mind, I submit, for the reasons discussed below, that it would be a serious mistake for West Virginians to change our present system for choosing judges.

Fortunately for our state, I think the likelihood of such a change is nil. I do not believe that the citizens of Raleigh, Hardy, or Han-

cock counties, etc., are going to seriously entertain the idea of letting a few lawyers and other political appointees have the major say in who their local judge is—or in who serves as the judges that hear appeals from those counties.

I thank my readers in advance for their attention. I also thank all those West Virginians who participate in selecting our judges by casting ballots in our elections. It is people who vote who ultimately give our court system its legitimacy as an independent branch of government, protective of the rights enshrined in our laws and *Constitution.*

## 1. Competitive Electoral Judicial Selection is a Desirable and Time–Tested Democratic Process.

There is a great deal of political science research, scholarly opinion, and just plain common sense in support of choosing our judges in elections. Researchers agree that the competitive election process results in just as able or "qualified" a judiciary as the appointment process.[6]

Moreover, it is widely found that there are substantial social and political virtues associated with the competitive election of judges.[7] These virtues include the accountability [8], in-

---

6. Our research confirms previous studies which find little evidence that selection systems produce judges with markedly different or superior judicial credentials or that they vary on most other background characteristics.... we find that selection systems have no important impact on selecting judges with different or superior credentials for office....
Henry R. Glick and Craig F. Emmert, "Selection Systems and Judicial Characteristics: the Recruitment of State Supreme Court Judges," 70 Judicature No. 4, 228, 235 (1987). *See also* David Adamany and Philip Dubois, "Electing State Judges," 1976 Wis. L.Rev. 731 773.
"Amid the clamor of contentions in support and opposition to each of the [judicial selection] systems, there have emerged several empirical studies which demonstrate that, in many respects, the benefits of any one system over another are negligible."
John M. Scheb, II, "State Appellate Judge's Attitudes Toward Judicial Merit Selection and Retention: Results of a National Survey," 72 Judicature No. 3, 170 n. 8 (1988) (citations omitted).

7. Too often it has been assumed, without argument or discussion, that the only major objec-

tives in judicial selection are to secure judicial independence and to recruit the "highest quality" legal professionals to staff the bench. Other goals, such as judicial accountability or the desirability of having a judiciary that is broadly representative of the population that it serves, are assigned positions of secondary importance or go unnoticed entirely. As suggested above, the experience of most jurisdictions with merit selection plans has not been the elimination of political considerations from judicial selection, but the substitution of some kinds of political forces by others.
Phillip L. Dubois, "Accountability, Independence and the Selection of State Judges: the Role of Popular Judicial Elections," 40 S.W.L.J. 31, 32 (1986) (citations omitted).

8. There is no escaping that judges make policy. Since any judicial decision involving broad policy questions advantages some interests far beyond the immediate litigants and disadvantages other interests, one scholar has argued that "a judge is in the political process and his activity is interest activity not as a matter of choice but of function." The mere

dependence [9] and legitimacy of the judicial branch of government—and the selection of persons as judges who are involved in and attuned to their communities.[10] A competitively elected judiciary has been said to result in a more well-rounded, responsive and enlightened bench.[11] Certainly, that is our general experience in West Virginia.[12]

Importantly, competitive elections open the judicial selection process to new and chal-

act of deciding is inherently policy formulation in such cases. But judges make policy as a matter of choice as well as function, for most know that sweeping public issues are involved and they act upon their personal values in resolving those issues.

Since judges make public policy, it follows that, like other policy makers, they should be accountable to the people in a representative political system. Accountability usually means that those who lead policy making departments are subject to direct, periodic popular review in elections. In some cases, accountability may be achieved indirectly through the appointment of policy makers by those who are periodically subject to voter approval. David Adamany and Philip Dubois, "Electing State Judges," 1976 Wis. L.Rev. 731, 768 (footnote omitted).

9. The judiciary is the strong and effective shield of the personal rights of the subject or citizen, against executive tyranny and legislative encroachment. It should be kept separate from and independent of both. Liberty has every thing to fear from the union of the judiciary with either, and the effect of a disguised dependence is as dangerous as an ostensible union. *Montesquieu* in his "Spirit of Laws," says "There is no true liberty if the judiciary power be not separated from the legislative and executive powers." The same view will be found reiterated in the Federalist, that text book of the American Constitution:—"Though individual oppression may now and then proceed from the courts of justice, the general liberty of the people can never be endangered from that quarter, so long as the judiciary remains truly distinct from both the Legislature and the Executive." W.E. Drake, *Remarks of Mr. Smyser of Adams County, in the House of Representatives, on Thursday, the 14th of March, 1850, on the Bill To Amend the Constitution by Providing for the Election of judges by the People,* Pa. Telegraph, Mar. 23, 1850, at 2, *quoted* in Harry L. Witte, "Judicial Selection in the People's Democratic Republic of Pennsylvania: Here the People Rule?" 68 Temple L.Rev. 1084, 1116 n. 210 (1995).

10. At the simplest level, partisan elections are much more likely to assure the existence of opposition, vigorous criticism of those in power, and effective presentation of alternative policies. Political party leaders feel an obligation to recruit qualified candidates for each partisan office contested in an election, if for no other reason than to fill out and balance the party ticket. Further, party organizations provide some of the campaign resources necessary to promote a candidate and his program. David Adamany and Philip Dubois, "Electing State Judges," 1976 Wis.L.Rev. 731, 774–778.

11. The position in favor of accountability and *judicial elections assumes both a different view* of the judicial function and of the basis of popular support and respect for the courts. In this view, the process of judicial decision-making, particularly at the level of state supreme courts, is far from straight-forward or predetermined by legal precedents and the principles of syllogistic legal reasoning. Rather, judges must often exercise their discretion and in so doing are influenced by their own political, economic, social, and moral viewpoints. And, in a democratic political system, voters are entitled to periodically select those who make law and public policy, including those who interpret their laws and give meaning to the constitution. Phillip L. Dubois, "Accountability, Independence and the Selection of State Judges: the Role of Popular Judicial Elections," 40 S.W.L.J. 31, 51–52 (1986) (citations omitted).

12. Popularly elected judges occasionally might perceive a sense of mandate for them to act differently than other elected officials. For example, in a 1978 interview (reported in John Patrick Hagan, *Policy Activism in the West Virginia Supreme Court of Appeals,* 1930–1985, 89 West Virginia Law Review 149, 164 [1986]), Justice Darrell McGraw of the West Virginia Supreme Court of Appeals noted: [T]he West Virginia court over the years has been primarily an appointed court. That is to say, that the way one got on the Supreme Court was to be appointed by some friend who was a governor and then to run for election after the appointment.... [The] current court consists of four [of a total of five] members who actively sought the office of Supreme Court of Appeals and were not appointed by any executive authority. We probably feel a devotion to an independent judiciary, which some people in the past have not felt.... [The state] Constitution quite clearly says that the three branches of government ... are separate, distinctive, and independent, and our court is determined to vindicate that separation. Daniel R. Pinello, *The Impact of Judicial-selection Method on State–Supreme–Court Policy: Innovation, Reaction, and Atrophy,* 135, 140 n. 31, Greenwood Press, 1995.

lenging people and ideas. Innovative and energetic self-starters who have not received "the establishment's" blessing—are able to compete for judicial positions.[13] Judges who come to office in this independent fashion help insure a fair forum for citizens who come up against the "powers that be."

In summary, the advantages of competitive judicial elections are numerous and well-documented. West Virginia is a better place because we have these advantages.

## 2. West Virginia Currently Has an Appropriate Balance of Electoral and Appointment Based Judicial Selection.

Most states in our Union, including West Virginia, rely upon some system of popular elections to choose their judges.[14] However, in states that use elections, the appointment of judges nevertheless plays a significant role in the judicial selection process.

This is because a substantial percentage of judges do not complete their full terms of office. Career changes, financial issues, death, retirement, and disability all combine with long judicial terms of office, to produce many vacancies during a judicial term.

Thus, on a regular basis, replacements for judges who do not complete their terms are appointed to office. Many of these appointed judges run for office in the next election, with the advantage of incumbency.

In West Virginia, appointment to the bench has been the beginning of some distinguished judicial careers. As West Virginia State Bar President Elliot Hicks noted in a recent article in the *West Virginia Lawyer*, appointment has opened the judiciary to under represented groups like African–Americans and women.

My point is this: to have a balanced role for "appointive judicial selection" in West

---

13. But the impact of the traditional elective system may be even greater at the point of entry, because it opens every initial judicial election and subsequent re-election to competing candidates. One cannot well treat judgeships as elective and not expect many of them to be contested and some filled by self-starters, particularly self-starters with political skills whose names are known from past elections for some other office.

\* \* \*

Once we gave up drawing our highest judges in a genetic lottery, by birth into the House of Lords, every system of judicial selection other than some form of competitive civil service examination had to be political. The interesting question is what kind of politics distinguishes the different systems.

\* \* \*

In essence, as Justice Grodin says, the tension is between professional and popular standards of judging judges. The law schools' Platonic ideal might be judges chosen by professors and confirmed by law review editors, but I do not recall that this ideal was shared by the rulers or citizens even of Athens. The knowledge of having been elected directly by the people can be a source of strength as well as of weakness. Many theorists unaccountably cite the lack of accountability of lifetime appointed judges as an argument against enforcing constitutional law against elected officials, but I hear no argument that we elected judges should do our job differently or less professionally because we are "accountable." In our court, I have never heard popular or political reaction discussed as a factor bearing on the decision before us. To adopt Justice Otto Kaus's much-quoted simile for the risk of defeat in a judicial election, if you cannot cope with the crocodile, get out of the bathtub.
Hans A. Linde, " Elective Judges: Some Comparative Comments," 61 S.Cal.L.Rev.1995, 1997–98, 2004 (1988).

14. Today there are only twelve states in which the majority of judges are not directly elected by the people. Most of these states select their judges through executive nomination and legislative confirmation. In the remaining thirty-eight states judges are subject to popular elections.
Jason Miles Levien and Stacie L. Fatka, "Cleaning up Judicial. Elections: Examining the First Amendment Limitations on Judicial Campaign Regulation," 2 Mich.L. & Pol'y Rev. 71, 74–75 (1997) (footnotes omitted).
The rise of popular, partisan election of appellate judges is best understood as an essentially thoughtful response by constitutionally moderate lawyers and judges in the Whig, Democratic, and Republican parties.... popular election was not viewed as inconsistent with the ideal of a powerful independent judiciary. Indeed, elections were seen as the mechanism by which the courts could call upon a base of popular support and credibility sufficient to allow them to effectively rival legislative and executive power.
Phillip L. Dubois, "Accountability, Independence and the Selection of State Judges: the Role of Popular Judicial Elections," 40 S.W.L.J. 31, 35 (1986) (citations omitted).

Virginia no change is needed. We have such a role, we have had it for over 100 years, and it is working. (See note 8.)

### 3. To Argue That "Politics" Can Be Removed from Judicial Selection Is Either to Be Unrealistic, or to Be Concealing One's Own Political Agenda.

In 1801 John Marshall, rather than Judge Spencer Roane, the distinguished Virginia jurist for whom my home town and county were named, was appointed to the United States Supreme Court. Why? Because Marshall had more political clout than Roane.

This statement should come as no surprise. The scholarly and professional consensus is overwhelming that the selection of judges (including all federal judges), whether by election or by appointment, has always been political.[15, 16]

Thus, the issue is *not* whether there will be politics in the judicial selection process, for the selection of judges always has been and always will be political. The issue is: what sort of politics? The politics of the few—or the politics of the many?[17]

**15.** Reflecting on this body of empirical work, one realizes the extent to which politics—partisan politics and bar politics—pervades every type of selection mechanism.

\* \* \*

Regardless of the form of the selection mechanism, the content seems constant. Choosing judges in America is a political process with a political result. The major loss in accepting this past and present reality is the illusion that our judges are totally above politics. While reformers have often wanted us to believe the recruitment and selection of our judges should be beyond politics, we have yet to determine if that is a result either achievable or desirable—even if it could be concretely imagined. For if limited resources are to be divided in a world in which demand all too often exceeds supply, what will be the standard of distributive justice that includes no concept of politics? Even those who believe in "equal opportunity for all" must confront the truth that all never have equal social position or talent, and our judges must of necessity apply some concept of right in order to decide disputes wherein everyone cannot have what is claimed as deserved.

Thus we have senatorial courtesy, and we should never expect that our judges will be "value free." The motives behind reform movements designed to change judicial selection mechanisms can often be reduced to a claim that the judges currently being selected are objectionable—politically objectionable to the reformers. While our attention is focused on the debate over the change desired in the selection mechanism itself, the change may not be fully comprehended until we ask, "What different types of judges do the reformers envision this changed mechanism will produce?" By keeping our attention on the result sought rather than on the debate over procedure, we can often cut to the heart of the matter more quickly.

The curious aspect of this entire question has been the reluctance of Democrats to admit they want Democratic judges, and of Republicans to admit they want Republican judges. Virtually nowhere in the literature does anyone face this question directly and either argue for it or against it. We prefer the debate over merit selection because we think when we are articulating a principle above politics. We can then posit and believe that we are looking for judges who apply those abstract and universal principles of justice we believe exist, even if we have not yet stated them in practice with the certainty and permanence of logical necessity. Jerome R. Corsi, *Judicial Politics* 113–14, 153, Prentice–Hall 1984.

**16.** "The process of picking a person to be a judge is woven into the political fabric and is, by any definition, a political process." Daniel J. Meador, *Some Yins and Yangs of Our Judicial System*, 66 A.B.A. J. 122, 122 (1980), *quoted in* Peter D. Webster, "Selection and Retention of Judges: Is There One 'Best' Method?", 23 Fla.St.U.L.Rev. 1, 3 n. 4 (1995).

"In every state a judge needs to be some kind of politician." Richard Neely, *Why Courts Don't Work* 41, Houghton Mifflin, 1980.

**17.** Investigative reporting has been sorely lacking in comparing the chances of public interest attorneys, plaintiffs' attorneys, union attorneys and corporate attorneys of gaining seats on the federal bench—or in examining the client and prior law firm base of judges who have ruled that gun manufacturers have no liability to families of murder victims; that tobacco companies have no liability to families of cancer victims; that the scope of permissible affirmative-action programs should be steadily reduced.

Advocates of "merit selection" hew to the line that merit is to be determined by the nebulous criterion of reputation rather than by objective measurable criteria. They do not seek civil service tests or advanced legal degrees or even extra hours of continuing legal

I favor a politics that gives all citizens a direct voice in choosing judges—in an open and competitive marketplace. I disfavor a politics that gives the choice of judges to a select few, behind closed doors.[18] I also believe in merit selection—but with the merit of judicial candidates being determined by the electorate rather than by a handful of the politically powerful.

I believe that my view is shared by most West Virginians. I doubt that West Virginians would favor a system where our state judges are selected by a non-elective—but undoubtedly political—process.

### 4. West Virginia's Judicial Election Campaign Finance Laws Represent a Fair and Workable Compromise that Reflects Current American Political Philosophy.

The financial cost of running a competitive election campaign, especially state-wide, is substantial. It frequently serves as the focal point for disfavoring the election of judges. However, West Virginians are ahead of the curve in judicial campaign finance regulation. We limit and make public campaign contributions in a way that a number of other states are just trying out. And campaign finance committees insulate judicial candidates from fundraising.

I do favor reducing political campaign costs—for example, by providing free or low-cost air time to candidates. But the issues of campaign costs and financing are distinct and different from the issue of judicial selection methods. Campaign finance issues should not be used as a smokescreen for depriving West Virginians of the right to choose judges in competitive popular elections.

### 5. "36 Hours on the Campaign Trail" Or "What Makes A Good Judge?"

The following notes, taken from my campaign experience, reflect the grass-roots realities of the judicial election process.

Wednesday, early April, 1996. Awake 6:00 a.m., leave house in Morgantown at 6:30 a.m., pick up traveling partner Ron Kelly. We head for Wheeling, about eighty miles on I–79. Arrive Wheeling around 8:00 a.m. Leave requested campaign signs and brochures in Electrical Workers and Carpenters' Union doorways. Drive to Laborers' Union office, meet with local president, leave materials. Then drop off materials at two lawyers' offices. Drive to Weirton and meet with Steelworkers' Union board. Noon—lunch at Nick's Village, local political tavern. 1:00 p.m., drive to New Cumberland. Visit magistrate and judicial offices. Stop and shake hands at businesses, malls.

3:00 p.m., head for Franklin in Pendleton County, over 150 miles away—my first campaign visit there. Travel through Elkins, stop and put up road signs. Dinner at Franklin KFC. Arrive at Democratic Rally about 7:00 p.m. Speak, answer questions, meet voters. 9:30 p.m.—stop at convenience store, get coffee. Ron says we need some more signs in this area. Put up signs in Seneca Rocks area. Head home to Morgantown, drop off Ron.

Arrive home at 2:00 a.m. My wife Becky tells me that I am wanted at the union hall in Weirton at 5:00, to go to the plant gates at 5:30 with union steward and lawyer. They assumed I had stayed in the Weirton area. Union has 5600 members. Need to go. Shower, change clothes, leave home at 3:00 a.m. Arrive at Weirton 5:00 a.m., stop at Hardee's for coffee. 5:30—8:00 a.m., meet 800 workers at four different work gates. Travel to city offices,

education to measure legal knowledge, or any specific measure of legal scholarship, or any specific measure of experience, objectivity or character. They believe that the definition of merit varies from individual to individual, from case to case, from day to day.

A system of elections in which all citizens have the right to participate is more likely to serve public interests than a system in which participation is limited to economic, legal and political elites.

Mark B. Cohen, Chairman
Democratic Caucus
Commonwealth of Pennsylvania House of Representatives
Letter, *The Nation Magazine*, March, 1998.

18. Officials of state bar associations have been the first to admit that the merit selection system provides them with the most effective means of influencing the choice of who will serve on the bench.
Mary L. Volcansek, "The Effects of Judicial-Selection Reform: What We Know and What We

campaign. 12:00 luncheon with local supporters. 2:00 p.m. Travel to Wheeling—revisit courthouse, spend 1 ½ hours visiting offices. Head toward home, pull off to nap. Traffic too noisy to sleep, drive home to Morgantown. Sit in recliner, turn on news, asleep within 30 seconds. Full day of campaigning tomorrow!

Reflecting on this campaign trip and dozens like it, I conclude that I am a better person and a better judge, because of my time on the campaign trail.[19]

Each voter with whom I have spoken—and there are thousands—has strengthened my commitment to do a quality job for my fellow citizens.[20] Each vote cast in a judicial election—*including the votes cast for my opponents*—reminds me to try not to disappoint the voters' faith in our democratic system.

Here is a challenging fact about our present judicial selection system: it gives the same weight to the opinion of a minimum-wage dishwasher, as it does to the opinion of a multimillionaire.

The "merit-selection" arguments against popular judicial elections in essence ask: what does a dishwasher know of judging? But one might as well ask, what does a dishwasher know of governmental budgeting, or of foreign policy? Perhaps not much. Yet it is the key to our system that we entrust the selection of key public officials to our citizenry in general, rather than to elites with purportedly superior knowledge and training.

To me, this egalitarian, one-person/one-vote approach to selecting those who exercise state power—including the power of judging[21]—is the essence of sustainable "good government."

Do Not," in *The Analysis of Judicial Reform*, 79, 87, Philip L. DuBois, ed., D.C. Heath 1982 (citation omitted).

19. Physical effort of campaigning, candidate's time consumed in a political race, campaign expenses, and general indignities of direct exposure to the voting public are the inconveniences most frequently named. Standing alone, these are not asserted to be sufficiently objectionable to support adoption of a nonelective plan, but when considered in light of their discouraging effect on prospective judges, the case is thought to have been made. It may be easily overlooked, but uncertainty, inconvenience, and sacrifice have gone hand in hand with service to country, and no citizen has reason to be assured that their removal guarantees, or even suggests, dramatic improvement in public service or public servants.
Phillip L. DuBois, *From Ballot to Bench* 12, University of Texas 1978.

20. There's no way a judge is going to be able to ignore the political consequences of certain decisions, especially if he or she has to make them near election time. That would be like ignoring a crocodile in your bathtub. (Former California Supreme Court Justice Otto Kaus, *quoted in* Reidinger, *The Politics of Judging*, A.B.A. J., Apr. 1, 1987, at 52, 58.)

 * * *

 In reality, judges are not asked to refrain from deciding political questions at all; rather they are asked to refrain from deciding political questions in too openly partisan a fashion.... Paradoxically, the effectiveness of an appellate judicial decision is related to its ability to transcend mere partisanship; and yet the more effective a decision, the wider its political impact. (G. White, *The American Judicial Tradition*, 371 (1976)).
*Quoted at* Robert F. Utter, "State Constitutional Law, the United States Supreme Court, and Democratic Accountability: Is There a Crocodile in the Bathtub?", 64 Wash.L.Rev. 19 (1989).

21. Rather than seeing the process of judicial decision-making as one in which judges serve to apply fixed and enduring principles of law impersonally and impartially, it is possible to see the tasks of judging as calling for far more discretion and human judgment. Whether engaged in the resolution of constitutional, statutory, or common law cases, judges are required to make choices in their determination of the relevant facts, in the selection of the appropriate legal principles and precedents, and in the application of those principles to the determined facts. These choices are pregnant with underlying questions of equity, justice, and public policy which are inevitably influenced by the judge's personal attitudes and values. In making these choices judges, like other political decision-makers, "allocate values in society such as opportunity, liberty, money, protection, or representation in other types of decision-making. Like other political decision-making, this allocation of values is differential; that is, some individuals and groups are favored and others are disadvantaged." Accordingly, in a democratic political system governed not entirely but in the main by the principle of majority rule, judges should

I'm at the age when I'm beginning to acknowledge my accomplishments, instead of disparaging them. So I'll admit that I'm proud of what I have done over many years (working with others, of course) to try to build good government in West Virginia.

Based on that experience, I'm certain that changing West Virginia's current electoral system for choosing our judges, would not be a move in the direction of good government.

be held popularly accountable for their decisions.

\* \* \*

However, by comparison with trial courts, appellate courts, and especially state supreme courts, are less frequently called upon to implement narrow procedural rules, more frequently asked to answer questions with importance beyond the immediate case at hand, required to exercise more discretion, and in general play "a (more) significant role in the policy making process of their state." For these reasons, when selecting the state's highest judges, it is particularly appropriate to strike the accountability/independence balance on the side of accountability.

Phillip L. Dubois, "Accountability, Independence and the Selection of State Judges: the Role of Popular Judicial Elections," 40 S.W.L.J. 31, 38–40 (1986) (footnotes omitted).